# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

KRISTEN E. JONES,                §
                                 §
                    Plaintiff,   §
                                 §
v.                               §          CIVIL ACTION NO. H-03-2286
                                 §
BILL WHITE, CITY OF HOUSTON,     §
SHIRLEY DELIBERO, *et al.*,      §
                                 §
                    Defendants.  §

## MEMORANDUM AND ORDER

In this disability discrimination case, plaintiff Kristen E. Jones sued the City of Houston and its mayor, Bill White (together, the "City"), and the Metropolitan Transit Authority of Harris County and its president and chief executive officer, Shirley Delibero (together, "METRO"). Jones alleged violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131 *et seq.*; section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; Chapter 121 of the Texas Human Resources Code; and Article 9102 of the Texas Revised Civil Statutes.[1] (Docket Entry No. 19). Jones alleged that the City and METRO discriminate against the disabled by failing to provide wheelchair access to streets, crosswalks, and sidewalks affected by roadway and utility construction. (*Id.* at ¶ 2). Jones

---

[1] Article 9102 of the Texas Revised Civil Statutes, the Texas Architectural Barriers Act, is now codified at Chapter 469 of the Texas Government Code. Tex. Govt. Code §§ 469.001-.208 (Vernon Supp. 2004).

also alleged that defendants' existing facilities are inaccessible to persons in wheelchairs. (*Id.* at ¶ 3).

This court resolved a number of legal issues in a previous Memorandum and Order, (Docket Entry No. 64).  Jones has moved for reconsideration of certain aspects of that decision. (Docket Entry No. 106).  Jones also sought interim attorneys' fees. (Docket Entry No. 92).  This court held a five-day evidentiary hearing as to the nature and extent of the relief Jones sought.  The parties filed posthearing briefs and the City submitted more current information on the criteria it used to replace or modify certain curb ramps and the status of such work. (Docket Entry Nos. 108–11, 127, 132–34, 137, 138).

After reviewing the motions, briefs, and responses; the testimony and exhibits; the record; and the governing law, this court: finds that Jones's claims against METRO lack necessary legal and factual support and are dismissed; grants in part and denies in part Jones's claims for relief against the City; grants in part and denies in part Jones's request for a permanent injunction against the City; and denies Jones's request for interim attorneys' fees.  The parties are ordered to advise this court as to the issues remaining in this case, including damages and fees, and a proposed schedule for resolving them, no later than **September 15, 2006**.  A hearing will be held on **September 26, 2006, at 10:00 a.m.** to set a schedule to conclude this case.  The reasons are explained below.

## I.    Background

2

Jones resides in Houston, Texas.  She is a quadriplegic who uses a wheelchair.  Jones has served on the City's Commission on Disabilities, advising and making recommendations to City officials on the needs of the disabled.  (Docket Entry 20, Ex. C at 189–90).

METRO is a government entity created under Texas Transportation Code § 451.052. It provides and facilitates mass transit within the Houston, Texas area.  (Docket Entry No. 32 at 11).

The City of Houston is a municipality incorporated in the State of Texas and is responsible for the construction, operation, and maintenance of the streets and highways within the City limits.  (Docket Entry No. 19, ¶ 10).

This case involves two projects, the City's Spur 527 Traffic Mitigation Plan and METRO's Regional Computerized Traffic Control System project (the "RCTCS Project"). The City is reconstructing U.S. Route 59 near downtown Houston.  The City's Spur 527 Traffic Mitigation Plan is a companion project designed to relieve the increased traffic expected in the neighborhoods around U.S. 59 during the Spur 527 reconstruction.  At a previous hearing, Rickey Grochoske, a City traffic engineer familiar with the Spur 527 Traffic Mitigation Plan, testified that the Plan includes changing lane striping, removing bicycle lane markings, and transforming a major street – West Alabama Street –  from two to three lanes with the center lane reversible.  (Docket Entry No. 24, Ex. 35I, at 155–162). Grochoske reported that the Spur 527 Traffic Mitigation Plan includes street resurfacing in certain areas.  When the City resurfaced these streets, it milled down the surface, poured new asphalt, and adjusted the manhole covers to accommodate the new street level.

METRO's RCTCS Project is designed to "update signal devices and adjacent areas to increase mobility and to better handle traffic flow and general transportation." (Docket Entry No. 12, ¶ 16). Under the RCTCS Project, "signals are being upgraded to include communications equipment to allow communication between the signals, TranStar, METRO buses, and emergency vehicles." (Docket Entry No. 32, ¶ 63). METRO's Director of Traffic, Eugene Smith, explained the RCTCS Project:

> Related to the functions we're providing, we are enhancing traffic signals such that they are providing a communications link from the intersection back to a central control point at a building called Houston TranStar. We are upgrading the computer, which controls the traffic signal indications to a modern solid state model. We are providing a feature that is called transit signal priority that will enable a bus to request some extra green time to enhance schedule reliability and also allows an emergency vehicle such as an ambulance to request a more immediate green light for a situation where they would be responding to an emergency.

(Docket Entry No. 32, Ex. 7 at 32). Jeff Sargent, Jr., METRO's Manager of the RCTCS Project, clarified that the Project includes "only those items that were necessary to modernize the traffic signal equipment at each intersection, address transit signal priority, and assure that each intersection is ready to be a part of a system-wide communications network that will connect all traffic signals to a central control facility in the near future." (Ex. 32 at 5).

METRO's RCTCS Project covers over 1,350 intersections across the City of Houston. METRO is replacing traffic signal poles, which can require construction work on the surrounding sidewalk area, in a small percentage of these intersections. METRO is performing electrical work on existing traffic signal poles without replacing them in most of

4

the City intersections.  (Ex. 31).  According to a City contractor, "the project consists of replacing traffic signal controllers and controller cabinets, replacing traffic signal heads, installing new loop detectors, installing bus preemption, re-cabling some intersections . . . and replacing some signal poles."  (Ex. 32 at 3).

Jones filed this suit on June 27, 2003 and moved for a temporary restraining order. (Docket Entry No. 3).  This court held a hearing and denied Jones's TRO application on July 10, 2003.  Jones then filed a motion for preliminary injunction or, alternatively, for partial summary judgment, asking this court to enjoin defendants from impairing wheelchair access through or around temporary construction zones and from altering streets or working on traffic signal poles without maintaining or providing accessible sidewalks, curb ramps, and crosswalks for the altered streets and intersections.  (Docket Entry No. 24 at ¶ 1).  In the alternative, Jones moved for summary judgment as to whether defendants' street resurfacing and traffic pole improvements qualify as "alterations" that triggered the federal accessibility requirements of 28 C.F.R. § 35.151.  (*Id.* at ¶ 13).

In a previous Memorandum and Order, this court granted Jones's motion for summary judgment in part and denied it in part.  This court held that resurfacing a street from intersection to intersection is an "alteration" under the ADA, 28 C.F.R. § 35.151, and requires the City to install curb ramps to meet ADA requirements.  This court rejected Jones's argument that the City would also have to make the entire length of the sidewalk between the curb ramps compliant with the ADA accessibility regulations for altered facilities if the City had resurfaced the adjacent street.  This court held that when METRO

5

installs a new traffic signal pole at an intersection, it alters the sidewalk area in which the pole is placed, triggering the requirement that the altered area comply with the ADA accessibility regulations for altered facilities.  (Docket Entry No. 64 at 45–46).

This court denied Jones's motion for a preliminary injunction because the record contained no details as to the curbs on resurfaced streets and the sidewalks around newly installed traffic signal poles were, or were not, ADA-compliant or as to any corrective work required.  This court ordered an evidentiary hearing to address the outstanding issues.  At the evidentiary hearing, this court heard testimony from Jones; Ken Otten, Jones's accessibility expert; Teresa Darr, the City's accessibility expert; Reid Msnry, who oversees and manages the construction for the City's capital improvement projects, including street resurfacing for the Spur 527 Traffic Mitigation Plan; Daniel Krueger, Deputy Director for Engineering and Construction of the City of Houston Public Works Department; and Eugene Smith, METRO's Director of Traffic.  After that hearing, this court requested further briefing on certain legal issues.  Resolving the permanent injunction request is now appropriate.

## II.    The Legal Standards and the Issues to be Decided

Jones seeks a permanent injunction enjoining the defendants from: violating the ADA; § 504 of the Rehabilitation Act; Jones's First and Fourteenth Amendment rights; altering any streets to eliminate or compromise the safety of bike lanes; resurfacing or reconstructing or otherwise altering West Alabama Street or any other street without installing sidewalks where missing or without bringing the adjacent sidewalks and curb ramps into ADA compliance; altering intersections to enlarge the curb radius where it would decrease

6

pedestrian safety or convenience; closing intersections to pedestrian crossings; erecting or maintaining traffic control devices that do not comply with the Texas and FHWA Manuals of Uniform Traffic Control Devices; failing to erect and maintain traffic control devices required under the FHWA and/or Texas Manual of Uniform Traffic Control Devices; installing curb ramps or sidewalks that fail to comply with the ADA; and issuing permits that will result in the installation or modification of curb ramps and sidewalks that fail to comply with the ADA.  (Docket Entry No. 19, ¶ 3).  Jones also seeks actual or statutory damages for each violation of Chapter 121 of the Texas Human Resources Code and her costs and attorneys' fees.  (*Id.* at ¶¶ 5–6).

### A.      The Permanent Injunction Standards

To obtain a permanent injunction, a plaintiff must establish all of the elements required for a preliminary injunction—a substantial threat that she will suffer irreparable injury absent the injunction; that the threatened injury outweighs any harm the injunction might cause the defendants; and that the injunction will not impair the public interest—in addition to showing success on the merits.  *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n.12 (1987); *Dresser-Rand Co. v. Virtual Automation, Inc.*, 361 F.3d 831, 847–48 (5th Cir. 2004).

### B.      A Public Entity's Obligations Under the ADA

Title II of the ADA prohibits discrimination against the disabled in the provision of public services.  Title II states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B). To establish a violation of Title II, a plaintiff must prove that (1) she is a "qualified individual with a disability"; (2) she is being excluded from participation in or being denied the benefits of some service, program, or activity by reason of her disability; and (3) the entity which provides the service, program, or activity is a public entity. *Civic Assoc. of the Deaf of New York City, Inc. v. Giuliani*, 970 F. Supp. 352, 358 (S.D.N.Y. 1997).

Section 504 of the Rehabilitation Act similarly provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA extends the protections of the Rehabilitation Act "to cover all programs of state or local governments, regardless of the receipt of federal financial assistance." *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000). Because the ADA specifically incorporates the rights and remedies available under the Rehabilitation Act, cases interpreting either statute apply to both. *See* 42 U.S.C. § 12133; *Hainze*, 207 F.3d at 799; *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002).

Title II directs the Attorney General to promulgate regulations implementing the statute. 42 U.S.C. § 12134(a). The Attorney General has issued those regulations at Title 28, part 35, of the Code of Federal Regulations, for "all services, programs, and activities

provided or made available by public entities."  28 C.F.R. § 35.102(a).  Part 35 addresses the accessibility of government "facilities," including roads, walks, and passageways.  *See* 28 C.F.R. § 35.104, codified at 28 C.F.R. §§ 35.149–35.151.

The regulations distinguish between newly constructed or altered facilities and existing facilities.  Section 35.150 governs "existing facilities."  It generally requires a public entity to "operate each service, program, or activity so that the service, program, or activity, when viewed in its entirety, is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150(a).  The program-access requirements for existing facilities under § 35.150 is more flexible and less stringent than requirements for newly constructed or altered facilities under § 35.151.  *See* Title II Preamble, Pt. 35, App. A at 492 (program-access requirement, which is lower than the standards for new facilities, applies to existing facilities); Preamble to Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities ("Title III Preamble"), Pt. 36, App. B at 645 ("In striking a balance between guaranteeing access to individuals with disabilities and recognizing the legitimate cost concerns of businesses and other private entities, the ADA establishes different standards for existing facilities and new construction.").  As to existing facilities, the regulations do not require a public entity to take action that would result in a "fundamental alteration in the nature of a service, program, or activity" or in "undue financial and administrative burdens."  28 C.F.R. § 35.150(a)(3).  An "existing facility" is one that was in place when the ADA became effective on January 26, 1992.  28 C.F.R. § 35.151(a).

In contrast to the flexible concept of accessibility permitted for existing facilities, the regulations for new construction and alterations are more specific and more demanding. *Kinney v. Yerusalim*, 9 F.3d 1067, 1071 (3d Cir. 1993); *Ability Ctr. of Greater Toledo v. City of Sandusky*, 133 F. Supp. 2d 589, 591 (N.D. Ohio 2001); *Giuliani*, 970 F. Supp. at 359. Section 35.151 provides in pertinent part:

> (b)  Alteration.  Each facility or part of a facility altered by, on behalf of, or for the use of a public entity in a manner that affects or could affect the usability of the facility or part of the facility shall, to the maximum extent feasible, be altered in such manner that the altered portion of the facility is readily accessible to and usable by individuals with disabilities . . . .

> (c)  Accessibility standards.  Design, construction, or alteration of facilities in conformance with . . . the Americans with Disabilities Act Accessibility Guidelines for Buildings and Facilities (ADAAG) (Appendix A to 28 C.F.R. part 36) shall be deemed to comply with the requirements of this section . . . .

> (e)  Curb Ramps

>> (1)  Newly constructed or altered streets, roads, and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a street level pedestrian walkway.

>> (2)  Newly constructed or altered street level pedestrian walkways must contain curb ramps or other sloped areas at intersections to streets, roads, or highways.

28 C.F.R. § 35.151(b)–(c), (e)(1)–(2).  The obligation of accessibility for new or altered facilities, unlike the obligation for existing facilities, does not allow for noncompliance based on burden.[2]

The ADA regulations do not provide specific objective compliance criteria for existing facilities.  Section 35.150(a) requires reasonable accessibility and usability of the "service, program, or activity" viewed in its entirety.  The parties dispute how to define "reasonable accessible to and usable by individuals with disabilities" under § 35.150(a) as applied to the aspects of curb ramps and sidewalks at issue in this case.  The accessibility consultants who provided testimony under Rule 702 of the Federal Rules of Evidence agreed that "usability" determines whether an existing curb ramp is ADA-compliant and that this standard is necessarily subjective.  Ken Otten testified on Jones's behalf that it is appropriate to use the new construction or altered facilities ADAAG standards found at Appendix A to

_____

[2]       The Texas laws under which Jones brings suit are consistent with the requirements of the ADA and the Rehabilitation Act.  (Docket Entry No. 19, ¶¶ 52-61).  Chapter 121 of the Texas Human Resources Code provides that "No person with a disability may be denied admittance to any public facility in the state because of the person's disability."  TEX. HUM. RES. CODE § 121.003(c).  The statute defines "public facility" to include streets, sidewalks and walkways.  *Id.* at § 121.002(5).  The statute adds that the discrimination it prohibits includes a failure comply with Article 9102.  *Id.* at § 121.003(d)(1).  The Texas legislature has recodified Article 9102, the Texas Architectural Barriers Act ("TABA"), at Chapter 49 of the Texas Government Code.  *See Spector v. Norwegian Cruise Line Ltd.*, 2004 WL 637894, at *9 (Tex. App.—Houston Mar. 30, 2004, no pet.).  TABA charges the Texas Commission of Licensing and Regulation with adopting various architectural standards and rules which it publishes at Title 16, chapter 68 of the Texas Administrative Code.  TEX. GOVT. CODE § 469.052; 16 TEX. ADMIN. CODE ch. 68 (West 2003).  Pursuant to this authority, the Commission has adopted the Texas Accessibility Standards ("TAS"), which establish a set of technical requirements for the construction of facilities modeled after ADAAG.  *See id.*; *Sapp v. MHI P'ship, Ltd.*, 199 F. Supp. 2d 578, 587–88 (N.D. Tex. 2002).  The Commission has defined "facilities" to mean "[a]ll or any portion of buildings, structures, site improvements, complexes, equipment, roads, walks, passageways, parking lots, or other real property located in the State of Texas."  16 TEX. ADMIN. CODE §§ 68.10(10).  In general, Texas courts interpret Texas antidiscrimination laws as consistent with the federal counterparts.  *See Caballero v. Cent. Power & Light Co.*, 858 S.W.2d 359, 361 (Tex. 1993); *Grady v. City of Ft. Worth*, 2002 WL 63010, *3 n.2 (N.D. Tex. Jan. 8, 2002).

28 C.F.R. part 36 and the TAS standards found in the Texas Administrative Code in assessing whether existing facilities meet the "usability" test, but acknowledged that no hard-and-fast criteria for "usability" are set out in the regulations.  (Docket Entry No. 122 at 266). The City's accessibility consultant, Teresa Darr, testified that existing facilities are not subject to the objective standards of ADAAG and TAS that govern newly constructed or altered facilities.  Darr and Otten agreed that there are no specific "usability" criteria. (Docket Entry No. 122 at 307).

The ADAAG and TAS standards that apply to newly built or altered curb ramps subject to § 35.151(e) are very specific.  *See* 28 C.F.R. Pt. 36, App. A (ADA Accessibility Guidelines For Buildings and Facilities, "ADAAG").  A ramp may not have a slope exceeding 8.33 percent, or 1:12 rise-over-run measurement.  ADAAG § 4.8.2.  The cross-slope may not exceed 2 percent or a 1:50 rise-over-run measurement.  *Id.* at § 4.7.2.  The transition between the ramp and street surface must have a grade of 5 percent or less, or a 1:20 rise-over-run measurement.  *Id.* at § 4.8.6.  Under the most recent version of ADAAG, the area at the top and bottom of a curb ramp must have a level landing, which must be at least as wide as the ramp leading to it and be a minimum of 60 inches clear.  *Id.* at § 4.8.4. The ADAAG does allow some deviation for "conventional building industry tolerances for field conditions," (*id.* at § 3.2), which the experts described as permitting an approximately 1 percent deviation for most measurements, but the standards are precise and objective.

The "usability" standard for existing facilities allows more discretion.  This court must determine whether the existing roads and sidewalks in the relevant area, viewed as a whole,

12

are readily accessible to disabled persons.  28 C.F.R. § 35.150; *Ass'n for Disabled Americans v. City of Orlando*, 153 F. Supp. 2d 1310, 1320–21 (M.D. Fla. 2001); *Pascuiti v. N.Y. Yankees*, 87 F. Supp. 2d 221, 226 (S.D.N.Y. 1999).  In *Pascuiti*, the court examined the relationship between the ADAAG standards, which are objective, with the looser, more subjective "usability" standard:

> [E]ven though only new construction and alterations must comply with the [ADAAG] Standards, those Standards nevertheless provide valuable guidance for determining whether an existing facility contains architectural barriers. . . . Thus, plaintiffs are allowed to compare facilities at the Stadium with the requirements laid out in the Standards as part of their effort to establish individual barriers to access.
>
> Allowing plaintiffs to use the Standards in this manner does not alter the ADA's lesser requirements for existing facilities.  It is the "readily achievable" requirement, defined as "easily accomplishable and able to be carried out without much difficulty or expense," 42 U.S.C. § 12181(9), that provides the lesser standard for existing facilities under Title III.  In order to establish that the City has violated the ADA, plaintiffs still would have to: (1) prove that the Stadium, viewed in its entirety, is not readily accessible to and usable by individuals with disabilities; and (2) suggest a plausible method of making the Stadium readily accessible, the costs of which, facially, do not clearly exceed its benefits.  The program access requirement, which mandates that the Stadium be viewed in its entirety, provides the lesser standard for existing facilities under Title II.  Allowing plaintiffs to use the Standards as part of their effort to establish the existence of individual barriers to access does not dilute either of those requirements.

87 F. Supp. 2d at 226 (internal citations and footnotes omitted in part).

The expert testimony on both sides of this case reflected the same understanding that there is no clear or specific test for analyzing "usability." While the standards for altered

facilities are a helpful reference point in evaluating barriers to access within existing facilities, the requirements for altered facilities cannot be wholly imposed on existing facilities.

During the pendency of this suit, the City has developed objective, specific criteria to measure whether existing curb ramps are "usable" and meet § 35.150 and, if not, what corrective action is required. The City developed these criteria based on field reviews and research by Darr and City engineers. (Docket Entry No. 123 at 454; Docket Entry No. 124 at 504, 506). Dan Krueger, deputy director for engineering and construction in the City's Public Works and Engineering Department, testified that under these criteria, a curb ramp with a slope exceeding 16 percent is not usable and would be replaced. (Docket Entry No. 125 at 647). For running slopes, the City views up to 12.5 percent as usable. If the slope is between 12.5 percent and 16 percent, the City considers the distance involved in determining whether the ramp is usable and requires the combined grade of two adjacent surfaces—usually two different parts of a single ramp—not to exceed 19 percent to be considered "usable." (Docket Entry No. 134, Ex. B at 2;[3] Docket Entry No. 135 at 11). The City views a cross-slope up to 6 percent as "usable." If a ramp has a cross-slope exceeding 6 percent, the City will replace the ramp with an ADAAG-compliant ramp. (Docket Entry No. 123 at 460; Docket Entry No. 124 at 504, 506). "Lip" or "vertical discontinuity"—the

---

[3] After the evidentiary hearing, the City formally adopted the standards and criteria about which Darr, Msnry, and Krueger testified. (*See* Docket Entry No. 134).

14

elevation change between ramp and street surface—exceeding one inch is "unusable" and would be corrected.  (*Id.* at 650).

If an existing ramp exceeds ADAAG/TAS standards for new or altered construction but falls below the criteria for "unusability" described above, the City evaluates the ramp using a "totality of circumstances" test to determine whether that ramp should be modified or replaced.  (*Id.* at 651).[4]  The City's accessibility expert is instructed to recommend corrective action based on field observations, even if the potentially deficient facility—such as a curb ramp—is not affected by alterations such as street construction or resurfacing.  In this case, however, the issues are limited to the extent of the City's and METRO's obligations to make sidewalks accessible when parts of the streets and sidewalks are altered in the Spur 527 Traffic Mitigation Plan and the RCTCS Project.

### C.     The Issues as to the City; Jones's Motion for Reconsideration

In the September 29, 2004 Memorandum and Order, this court agreed with Jones that the resurfacing of an entire street from intersection to intersection is an "alteration" to existing facilities that requires the installation of curb cuts and ramps at those intersections under 28 C.F.R. § 35.151.  (Docket Entry No. 64 at 45–46).  Jones and the City dispute the consequences of this court's prior ruling.  The parties agree that if a street is resurfaced, there are no curb cuts or ramps at the intersections on that street, and it is in a "pedestrian route," the City is required to build curb cuts and curb ramps that meet the ADA requirements for

---

[4]     Krueger testified consistently with Msnry that this lawsuit played a role in the City's implementation of certain new policies.  The City's decision to employ a RAS accessibility specialist, for example, was made in light of this lawsuit.  (Docket Entry No. 125 at 671).

new and altered facilities.  The City presented evidence that it met ADA obligations in the
Spur 527 Traffic Mitigation Plan by installing over 93 new curb ramps, including in corners
where none existed before, at intersections on resurfaced streets that are in pedestrian routes.
(Docket Entry No. 123 at 460).  Jones has presented no evidence that these newly installed
curb ramps fail to meet the standards under § 35.151(c) and (e).  A list of the newly
constructed curb ramps in intersections on resurfaced streets affected by the Spur 527 Traffic
Mitigation Plan is attached as Appendix  A.

    The parties dispute several aspects of work the City has not done.  First, the parties
disagree as to whether the City must improve existing curb ramps in intersections when the
street is resurfaced—assuming the intersections are in a pedestrian route—if those ramps
deviate from the ADA requirements for new construction or altered facilities but are not so
out of compliance as to be "unusable."  The City asserts that for such curb ramps, the
applicable standard is the "readily accessible" and "usable" standard for existing facilities
under § 35.150.  The City applies its newly developed "usability" criteria to determine
whether previously existing curb ramps need to be modified or replaced.  Jones asserts that
if an existing curb ramp is part of an altered facility—a resurfaced street—and does not meet
ADAAG requirements, it must be corrected even if it is "usable" under the City's standards.
The first issue in resolving this dispute is whether the § 35.150 "usability" standard for
existing facilities or the § 35.151 standards for altered facilities apply to previously installed
curb ramps along the resurfaced streets in the Spur 527 Traffic Mitigation Plan.  If the
usability standard applies, the specifics of that standard must be identified.

16

The parties also dispute the City's obligation to provide or improve ramps in intersections where the resurfacing is on a cross-street. This affects the number of ramps required to serve an intersection where the street resurfacing affects only one of the streets crossing that intersection, as well as whether the ramp is part of the altered facility and subject to the stringent ADAAG standards.

Third, the parties dispute whether the City had an obligation to provide or improve curb ramps if the resurfaced street is not in a "pedestrian route."

The resolution of these issues determines whether the City has met its obligations under the ADA with respect to curb ramps along resurfaced streets in the Spur 527 Project area. This court requested posthearing briefing from the parties on the following questions:

> (1)   Does the City have an obligation to improve curb ramps that are not in compliance with the applicable regulations, but, in the City's judgment, are nonetheless usable? What standard governs the "usability" determination?

> (2)   What obligation, if any, does the City have under the law as to (a) ramps where the street resurfacing is on a cross-street but not the street on which the ramp is located; (b) ramps (existing or potential) that are not in a "pedestrian route"; and (c) the number of ramps required to serve an intersection, particularly when the street resurfacing affects only one of the streets on the intersection?

In addition to submitting posthearing briefs, Jones moved for reconsideration as to this court's determination that sidewalks are separate facilities from streets. This court ruled that when the City resurfaces a street from intersection to intersection, it must install curb cuts and ramps on curbs that were affected by the street resurfacing to meet § 35.151(b) and (e). Jones asked this court to order that the City's obligation when it resurfaced a street was not only to install ADA-compliant curb cuts and ramps at intersections on the resurfaced street,

17

but also to perform construction or repair work to ensure that the entire sidewalk between the intersections and curb ramps is free from cracks, uneven surfaces, or other problems that might impede wheelchair travel. This court rejected Jones's expansive view of the City's obligation under the ADA. (Docket Entry No. 106).[5] As this court noted in its September 29, 2004 Memorandum and Order, "Section 35.104 lists 'roads,' 'walks,' or 'passageways' as separate facilities and limits the definition of 'facility' to mean 'all or any portion of' each." (Docket Entry No. 64 at 46). The cases Jones cites in support of her motion for reconsideration  recognize this distinction, explicitly or implicitly. *See Kinney*, 9 F.3d at 1073 ("Subpart (e) [of 35.151] effectively unites a street and its curbs [but not the sidewalks] for treatment as interdependent facilities."); *Ability Ctr. of Greater Toledo*, 133 F. Supp. 2d at 591–92 (distinguishing between existing and altered streets); *Deck*, 76 F. Supp. 2d at 822 (discussing the city's violation of ADA standards for construction on "curb ramps since May 6, 1996," well after the ADA requirements for new and altered construction had gone into effect); *Giuliani*, 970 F. Supp. at 359 (treating the push-button boxes as a single "facility," and not any area around the boxes such as the sidewalk as part of the facility). Jones has not presented new authorities or different arguments supporting a different approach. Jones's motion for reconsideration is denied.

### D.    The Issues as to METRO

---

[5] The motion for reconsideration also raises arguments that are addressed elsewhere in this opinion, including whether  sidewalks, ramps, or curb cuts are required on streets that are not a "pedestrian route."

In prior rulings, this court also held that while changes to existing traffic poles done through METRO's RCTCS Project are "alterations" under § 35.151, because the "altered" facility is the traffic pole itself,  the ADA did not require METRO to retrofit the sidewalk adjacent to the pole.  The sidewalk is a separate facility that is not "altered" by electrical work on an existing pole.  In contrast, when METRO installs a new traffic signal pole and disrupts the sidewalk to do so, both the pole and the altered part of the sidewalk surrounding the pole must be made accessible to the disabled, to the maximum extent feasible, under § 35.151.  This court sought posthearing briefing on the following question:

> What is METRO's obligation, if any, when it creates a "disturbed area" by installing a traffic signal pole?

## III.    The Evidence  Presented

### A.    The Evidence as to the City's Curb Ramps

#### 1.    *The Evidence as to Curb Ramp Problems and  the Standards that Apply*

Jones testified that she has trouble using many curb ramps.  She testified that she often encounters "lip" problems if the street surface is not even with the  ramp and gutter; if there is an uneven transition between street and ramp, the back wheels of Jones's wheelchair  can get caught.  Jones also complained that many of the ramps have sloping problems.  Certain ramps are too steep, making it difficult or impossible for Jones to get up or down the ramps safely in her wheelchair.  Other ramps have a "V" problem, which arises when the slope between the bottom part of the ramp and the slope of the gutter and street is excessive and causes the chair to "bottom out." Jones also complained that certain ramps are so uneven as

to be unusable or have severe cracks.  Other ramps have uneven areas at the bottom that permit rainwater, mud, leaves, and other debris to collect.  Jones is afraid to go through such areas for fear of damaging or losing control of her wheelchair.  Jones also testified that certain ramps lack flat landings at the top, which prevents her from stopping while crossing the street to observe traffic or to change directions.  She also testified that certain ramps have uneven or excessive cross-slopes, which can make them difficult or even dangerous to use.  Jones appropriately limited her testimony to her personal experiences, not the ADA legal standards.

The City responded by eliciting testimony from Jones that some ramps, although not perfect, were still "usable."  The City challenged several of the intersections Jones complained of as beyond the Spur 527 Traffic Mitigation Plan area.  The City also defended against Jones's complaints by arguing that she could have, but did not, use the City's Pedestrian Accessibility Review (PAR) Program to resolve her problems with the curb ramps.  The PAR program receives and responds to citizen requests for the installation and repair of sidewalks, accessible curbs, and traffic signals.  The City Public Works and Engineering Department administers this program.

Ken Otten, an accessibility compliance consultant Jones retained, testified about the applicable ADA and TAS standards, the four reports he submitted, and the tests he performed on the relevant street corners and traffic poles.  When asked about the "usability" standard applicable to existing facilities, Otten agreed with the City that the standard is "subjective." (Docket Entry No. 122 at 266).  He testified that certain DOJ regulations suggest referencing

20

ADAAG standards in assessing usability under § 35.150, but acknowledge that no hard-and-fast criteria for usability exist. He also admitted that using a specific individual, such as Jones, to determine "usability" may be problematic because certain factors may be unique to that individual. (*Id.* at 267). Jones, for example, may find a given ramp unusable while other wheelchair users find it usable. Otten's—and Jones's position—however, is that the new construction and altered facilities ADAAG standards apply to all the curb ramps at issue, so that the difference between § 35.150 and § 35.151 becomes irrelevant. (Docket Entry No. 122 at 271).

In discussing his report, Otten also conceded that "[t]here isn't a specific requirement for a level landing in the current edition of ADAAG. However, the new version of ADAAG, which isn't enforceable yet, does show a top landing specifically for purposes where somebody" wants to go around a curb ramp without going down and then back up the ramp that is used for entering and crossing the street. (*Id.* at 270). After questioning by the court, Otten again confirmed that neither ADAAG nor TAS requires a level landing. (*Id.*). The City's accessibility expert agreed with Otten on this point. (*Id.* at 382; Ex. 8 at 19; Ex. 8F at 16).

In discussing curbs that once met the applicable ADA standards but have since deteriorated, Otten could not point to a specific standard. (Docket Entry No. 125 at 753). Otten testified that distinguishing a ramp that was once compliant but has fallen into disrepair from a ramp that was never compliant at all can be done depending on the circumstances. (*Id.* at 755). He stated that he had not made such an analysis for this case. (*Id.*). Otten also

21

testified that, much like the standards applied to "existing" (*i.e.*, pre-1992) construction, any standard for compliant-yet-deteriorating ramps is necessarily subjective.  (*Id.* at 754, 766).

The City's expert, Teresa Darr, who is also an accessibility consultant, testified about the applicable ADA and TAS standards, Otten's reports, her own report and field work, and the City's approach to ADA compliance.  Darr agreed with the City that, absent an alteration such as street resurfacing that affects an existing curb or ramp, the existing facility must meet only a subjective "usability" standard, not ADAAG or TAS requirements.  Darr testified that "existing curb ramps which could . . . not serve pedestrian crossings on the altered streets are not required to be altered or brought into compliance as a result of the street overlay project." (*Id.*; *see also* Ex. 8 at 12 (Darr's Expert Report, confirming same)).

Darr, like Otten, explained that there are no existing specific "usability" guidelines for existing curb ramps.  (Docket Entry No. 122 at 307).  Darr looked to various sources, including ADAAG, TAS, Access Board publications, the Federal Highway Administration, other publications, and the DOJ, to try to develop "usability" guidelines.  (*Id.* at 305–07). In creating a "usability" standard for curb cuts and ramps, Darr determined that for a rise of six inches, the permissible slope would be from 1:10 to 1:12, with the maximum "usable" slope being 10 percent.  (*Id.* at 349).  Darr also determined that for a maximum rise of three inches, the slope could be as high as 12.5 percent.  (*Id.*).  These figures are more lenient than ADAAG's 8.33 percent requirement.  Darr relied on various Access Board research to determine these numbers.  The Access Board standard for historical buildings, for example is 16.6 percent; the Access Board also published research indicating that "[a] high percentage

22

of manual wheelchair users were able to traverse fairly steep slopes at 1 to 8 or the 12.5 percent over a 30-foot ramp.  And when you consider the curb ramp is only 6 to 8 feet, then that 12.5 percent slope becomes very usable."  (*Id.* at 351).  Darr testified that although a 12.5 percent slope over an entire ramp would not be desirable, a ramp of two feet or less with slopes of 12.5 percent, 13 percent, or even as high as 16 percent in some places, would be "traversable" and thus usable.  (*Id.* at 352).  With respect to change-in-grade criteria, Darr used allowable construction tolerances, which she stated were usually up to an inch.  Under this standard, Darr deemed any ramp with a change in grade of one inch or less to be "usable."  (*Id.* at 353).

For the usability standard, Darr referred to the Access Board Minority Report in which the author, a motorized wheelchair user, determined that his chair, which tended to "bottom out" more than most, could withstand up to a 19 percent total combined slope before it "bottomed out."  (*Id.* at 355–56).  Darr further testified that her research showed that if the curb had a level area of 24 inches or more at the bottom, the curb ramp could have an even greater slope (more than 19 percent) and still be usable.  (*Id.* at 357).  Darr determined that a combined slope of 19 percent should be considered "usable."  (*Id.*; *see also* Ex. 8 at 19).

In trying to determine a usability standard for adjoining slopes, Darr again referred to a Minority Report issued by the Access Board.  Darr testified that for new construction standards, the combined slope may be no greater than 13.33 percent, which is determined by

23

adding the maximum allowable ramp slope, 8.33 percent, to the maximum allowable bottom curb ramp slope, 5 percent.  (*Id.* at 354).[6]

In evaluating cross-slopes, Darr testified that research shows that most wheelchair users can use ramps with cross-slopes far in excess of current standards.  (*Id.* at 358).  According to one report, a cross-slope as great as 20 percent will not render a ramp unusable.  She testified that the report's overall determination was that a cross-slope up to 6 percent was usable.  (*Id.*).

Reid Msnry, managing engineer for the construction branch of the Engineering and Construction Division of the City's Public Works Department, testified that the City does not have a single written policy on curb ramps, but requires its contractors to stipulate that they will comply with all local, state, and federal laws, including the ADA.  (Docket Entry No. 123 at 466).  When asked about when certain curbs and ramps were constructed, Msnry testified that the City maintains records but has no central database.  (*Id.* at 491).  Additionally, Msnry testified that other entities, including utility companies, regularly perform construction on City ramps, which often lie in utility rights-of-way.  (*Id.*).  Msnry testified that ADAAG applies to reconstruction by the utility companies and that the

---

[6] Darr's report indicates two potential methods for calculating combined slope.  The first method should be used if the pre- and post-transition grades are in opposite directions (*e.g.*, one uphill and one downhill).  This requires adding the two grades together; for example, if the slope of the curb ramp is 7 percent and the inward slope of the gutter is 3 percent, the change of grade or combined slope is 10 percent.  The second method should be used if the pre- and post-transition grades are in the same direction (*e.g.*, an uphill followed by a steeper uphill).  This requires subtracting one grade from the other; for example, if a curb ramp with an 8 percent grade leads up to a sidewalk with a 15 percent grade, the change of grade is 7 percent.  (Ex. 8 at 17–18).

Engineer Office's inspection staff reviews this work.  (*Id.* at 492).  He also stated that all work done by utilities requires a permit and that the permit process requires ADAAG compliance.  (*Id.* at 493).

Msnry testified that the City did not have criteria for curb cuts and ramps when it began the Spur 527 Traffic Mitigation Plan street resurfacing work.  (Docket Entry No. 123 at 495).  He stated that the development of criteria was an ongoing process.  On questioning by the court, Msnry conceded that although the City has been resurfacing streets for years since the ADA's effective date, the first time the City implemented a written policy on ADA requirements for curb ramps at intersections affected by a resurfacing project was after this lawsuit began and this court scheduled a hearing on the merits of the case.  (Docket Entry No. 124 at 512).  Msnry testified that "it's true that this lawsuit brought to our attention certain things" and gave the City a "heightened awareness" of its ADA obligations.  (*Id.* at 512).  The City submitted a document entitled, "Street Overlay Policy," which described general guidelines that the City applied to the resurfacing project.  (Ex. 18).  The document called for a field review of streets subject to resurfacing and stated that the "survey is to ensure that the existing ramps along the path of the overlay work, if any, comply with current ADA standards."  (*Id.* at 2).  The document required construction of ramps in accordance with ADA standards for altered or new construction.  (*Id.* at 2–3).  The document also called for construction of ramps where none exist and limits the City's obligation to install new ramps to corners touching the affected overlay areas.  The document did not require any changes to existing ramps and did not require any work to build or change ramps at corners

25

where the street was not resurfaced. (*Id.* at 3–5). Msnry emphasized that this document was only a draft policy that was not yet adopted by the City. (Docket Entry No. 124 at 556, 575). After the hearing, the City submitted documents showing that the policy had been approved and put into effect. (Docket Entry No. 134).[7]

The City's "usability" standards are consistent with those presented in Darr's testimony. For running slopes, the City views up to 12.5 percent as usable. If the slope is between 12.5 percent and 16 percent, the City considers the distance involved in determining whether the ramp is usable, and requires the combined grade of two adjacent surfaces—usually two different parts of a single ramp—not to exceed 19 percent to be considered "usable." (Docket Entry No. 134, Ex. B at 2; Docket Entry No. 135 at 11). The city views any cross-slope up to 6 percent to be "usable." The City made this determination based on field reviews and research by Darr and City engineers. (Docket Entry No. 123 at 454; Docket Entry No. 124 at 504, 506). If a ramp has a cross-slope exceeding 6 percent, the City replaces the ramp with a fully ADAAG-compliant ramp. (Docket Entry No. 123 at 460; Docket Entry No. 124 at 504, 506).

2.      *The Evidence as to the Condition and Status of the Curb Ramps*

Ken Otten, the accessibility consultant Jones retained, went to each of the curbs that Jones complained about, evaluated it for compliance with ADAAG and TAS standards, and identified the type and severity of violations he found, with a "1" being the curb ramps most

---

[7] That filing also reported certain new curbs and ramps that the City has built or contracted for construction since the evidentiary hearing.

26

in need of remediation and "5" being the least.  (Docket Entry No. 122 at 225; Exs. 109–110).  Otten testified about how he made his priority determinations.  He viewed ramps severely out of compliance—ramps far in excess of ADAAG's 1:12 rise-over-run, or 8.33 percent, requirement—to be high priority, because a steep ramp will create significant problems for manual wheelchair operators to get up, and possibly down, the ramp.  (Docket Entry No. 122 at 243).  Although Otten acknowledged the difference between the standards for existing facilities, which use the looser, subjective "usability" standard, and those for new construction or altered facilities, which must meet the strict ADAAG standards without exception, Otten used the ADAAG criteria to determine whether a given ramp needed to be built or reconstructed.  Based on these measurements and his experience as an accessibility compliance consultant, Otten prioritized the corners he viewed to be the most problematic for disabled citizens.  (*Id.* at 244).

Otten testified that he did allow for some construction tolerances in his analysis.  For curb slope, for example, Otten indicated that a slope was compliant if the slope was 9.3 percent or less, even though ADAAG requires a slope no greater than 8.33 percent.  (*Id.* at 249).  With respect to the "V problem" about which Jones testified (which caused her wheels to get stuck), Otten testified that two ADAAG standards address that issue:  the requirement that the ramp's slope not exceed 8.33 percent and the requirement that the adjoining slope of the street not exceed 1:20, or 5 percent.  (*Id.* at 263).  Otten also testified that curbs Jones might describe as presenting "V problems" could also be listed as having "transition" or "lip" problems.  (*Id.* at 288).  Otten conceded that certain wheelchairs are more susceptible to

27

certain problems, and that a given curb ramp and adjoining street may be fully ADAAG-compliant, yet nevertheless give users like Jones the type of problems she described.  (*Id.* at 264).[8]

In his report, Otten identified twelve categories of deficiencies among the curbs that Jones identified as noncompliant.   Those categories are: (1) curb with no ramp, (2) completely noncompliant curb, (3) slope greater than 12.3 percent, (4) no clear width, (5) transition not flush, (6) adjoining slope greater than 5 percent, (7) no level landing, (8) cross-slope greater than 2 percent, (9) slope greater than 11.3 percent, (10) not textured, (11) slope greater than 10.3 percent, and (12) ramp under construction.  Otten's report indicates that a curb ramp with a slope exceeding 10.3 percent is "marginally compliant," (Ex. 11 at 2); he included the separate group of curb ramps with slopes exceeding 11.3 percent and a third group of curb ramps with slopes exceeding 12.3 percent to distinguish the levels of deficiency.  Otten listed those curbs with slopes greater than 12.3 percent as priority 1, curbs with slopes greater than 11.3 percent as priority 2, curbs with slopes greater than 10.3 percent as priority 3, and curbs with slopes less than 10.3 percent as acceptable.  (*Id.*).

---

[8]   In making rise-over-run measurements, Otten normally uses a digital slope meter called a Smart Tool or a Smart Level.  For this case, he used a Macklanburg Duncan 92288 Smart Tool. (Docket Entry No. 122 at 235, 237).  The user places the digital slope meter on a given ramp and the machine provides the ramp's slope, much like a bathroom scale might provide one's weight.  (*Id.* at 236).  No mathematical calculations are required to obtain a ramp's slope with a digital slope meter.  (*Id.*).  The digital slope meter itself, which is only six inches long, is housed in a wider casing to allow the user to obtain the slope over a greater distance; if a given ramp or curb is misshapen over a smaller area, the user can take the tool out of the casing to obtain a more accurate reading. (*Id.* at 236, 238).

The City's accessibility consultant and witness, Teresa Darr, performed field investigations of the same ramps, curbs, and intersections, and recorded measurements in largely the same way.  Darr testified about three differences in methodology:  (1) because ramps can vary with respect to slope from top to bottom, she generally took several different measurements of each ramp at various points and averaged them to come up with an overall slope, (Docket Entry No. 122 at 309); (2) Darr's report did not indicate any adjoining slopes in excess of 5 percent because she viewed almost no instances of this in her field evaluation (*id.* at 330); and (3) Darr noted where certain gutters widened to a "very low sloped or level area" for at least 24 inches after the ramp because, according to a Minority Report issued by the Access Board ("Building a True Community" by William D. Jordan), this improves usability (*id.* at 332).  Darr's report also identified which curbs and ramps were "existing," which were affected by, and part of, street resurfacing and which were not, which ramps were in the process of being designed, and the target date for constructing new ramps for certain areas.  (*Id.* at 335–37).

Darr testified that she applied several of Otten's conclusions to other places in his report to undermine his findings.  Darr testified that, in places where Otten's report indicated that a given curb or ramp was in substantial compliance, she took the slope measurements from that purportedly-substantially-compliant curb and compared those measurements to other curbs.  Darr found that several of the curbs Otten labeled as not substantially compliant had the same measurements as other curbs he found compliant.  (*Id.* at 342).  Darr also testified that she disagreed with Otten about whether to apply the standards for new

29

construction or altered facilities under § 35.151 or the standard under § 35.150 for existing facilities to certain curbs.  (*Id.*).  Darr evaluated the City's actions, including actions the City had planned or already made to fix certain deficiencies she identified.

Darr testified that the City's obligation to repair or replace altered roadways is further reduced where a given intersection is not in a "pedestrian route" as determined by City officials.  On cross-examination, Darr stated that there are several clear signs of a pedestrian route: where there exists a pedestrian crossing light, a striped crosswalk, or indicia of "a lot of pedestrian traffic."  (Docket Entry No. 122 at 366).

Darr had several responses to deficiencies Otten identified in his report.  First, Darr identified certain curb ramps as subject only to "usability" standards rather than ADAAG standards: ramps in intersections where the street resurfacing work did not extend into the intersection or ended before the intersection (identified in endnote 1 in her report); ramps in intersections where the resurfacing did not extend around the corner of the main street onto the side street (identified in endnote 2); and places where the City did not resurface, including the intersection of Greenbriar and U.S. Highway 59, which is under TXDOT's jurisdiction (identified in endnote 4), and the intersections of Greenbriar at Richmond and Eastside at Richmond (identified in endnote 10).  Darr also determined that several complained-of intersections and curbs were not subject to either usability or ADAAG requirements because they were not in pedestrian routes, which were identified in endnote 5.

30

Darr also found three general areas of disagreement with Otten's methodology. For some ramps, she indicated that a change in level of the ramp skewed the overall adjoining slope of the gutter, making the transition and slope problem appear worse than it is. These ramps were identified in endnote 7. For other intersections, she noted that the transition problem Otten noted results from overgrown grass or vegetation and does not constitute a "real barrier" because the accessible route for the given intersection is not required to be paved (identified in endnote 8). In endnote 9, Darr indicated curbs that had "rough paving" with a change in level of one-half inch to one inch, making an accurate measurement difficult to obtain. Darr also found two deficiencies in several intersections that required corrective action: curbs with broken gutters (endnote 11), and curbs with half-inch bumps in two places where parts of the original curb were not removed (endnote 12).

Jones's complaints about specific ramps, and the City's defenses, are summarized in the following table:

| Street 1 | Street 2 | Cr. | Complaint (Tr. Page) | Defense (Tr. Page) | Ex. |
|----------|----------|-----|----------------------|--------------------|-----|
| W. Alabama | Audley | SE | Cracks (151) | No overlay | 113-1 |
| W. Alabama | Stanford | NE | Too steep, Lip (156–58) | | 113-2 |
| W. Alabama | Stanford | NW | Too steep (161) | No overlay | 113-3 |
| W. Alabama | Stanford | SW | Too steep (164) | Usable (165) | 113-4 |
| W. Alabama | Day | SW | No flat landing (168) | Usable (169–70) | 113-6 |
| W. Alabama | Driscoll | SE | Too steep, bumps (170–71) | No overlay | 113-7 |

| W. Alabama | Dunlavy | NE | Too steep; ramp uneven (174) | Overlay does not cause | 113-8 |
| W. Alabama | Revere | NE | Too steep, cross-slope problems | | 113-9 |
| Fairview | Brun | SE | Lip at top (179, 181) | Usable (181) | 113-10 |
| Fairview | Brun | SW | | Usable (181) | 113-11 |
| Fairview | Dunlavy | NE | | Usable (181) | 113-12 |
| Webster | Chenevert | SE | No curb cuts (89) | | 113-14 |
| W. Alabama | Buffalo Speedway | SW | Bump in road (185) | Usable (185–86) | 113-15 |
| Webster | Chenevert | SW | No curb cuts (87) | | 113-16 |
| Westheimer | Greenbrier | SE | | | 113-17 |
| Westheimer | Helena | NW | Too steep (187–88) | | 113-18 |
| Westheimer | Kettering | SW | No level platform (92, 189) | Usable (189) | 113-19 |
| Westheimer | Midlane | NW | No level platform (93) | | 113-20 |
| Westheimer | Midlane | SW | Cracked ramp (94) | | 113-21 |
| Westheimer | Midlane | SW | Lip, no level platform (95) | | 113-22 |
| Westheimer | Persa | SW | Too steep (191) | | 113-23 |

| Westheimer | Ralph | NW | Too steep (192) | No overlay (192) | 113-24 |
| Westheimer | Revere | SE | Uneven ramp (bulge) (98) | No overlay (192) | 113-25 |
| Westheimer | Virginia | SE | Lip, pole in way (99) | No overlay (192) | 113-26 |
| Westheimer | Wesleyan | SE | Lip (100, 200) | | 113-27 |
| Westheimer | Westcreek | NE | Lip, too steep (101) | No overlay (195) | 113-28 |
| Westheimer | Westcreek | NW | Lip, too steep (101–02) | No overlay (195) | 113-29 |
| Westheimer | Westcreek | NW | Lip, too steep (103) | No overlay (195) | 113-30 |
| Westheimer | Westgate | NW | Too steep, no level platform (104, 107) | | 113-31 |
| Westheimer | Westgate | SW | | | 113-32 |
| Kirby | N. Braeswood | SW | | | 120 |
| San Felipe | Voss | | | | 121 |

For the challenged area (which covers the Spur 527 Traffic Mitigation Plan and certain intersections near Jones's home), Otten identified 59 curbs that lacked curb ramps entirely. (Ex. 112). When Darr performed her field test, she noted that the City had built 41 new curb ramps where none had existed before and had planned construction of another 11 new curb ramps. (Ex. 8E). The City did not build or plan to build new curb ramps for the seven remaining corners: (1) Kirby at Shepherd (north median); (2) Kirby at Shepherd (southeast corner); (3) Fairview at Dunlavy (southwest corner); (4) Fairview at Dunlavy

(northwest corner); (5) Webster at Chenevert (southwest corner); (6) Webster at Chenevert (southeast corner); and (7) Webster at Ferndale (southeast corner).  (*Id.*).  Of these seven curbs, Darr concluded that the first four were not subject to ADAAG requirements because the street overlay did not extend into the complained-of intersection and the last three did not require curb ramps because they were not in pedestrian routes.

With respect to the thirteen curbs that Otten found "completely non-compliant," the City built seven completely new ramps and slated one more for new construction.  For the remaining five ramps,[9] Darr found that the curbs were not subject to ADAAG requirements because although the main street at the intersection was part of the street resurfacing project, the complained-of curb was on a side street that was not resurfaced, and thus subject to, and met, the lesser less-stringent "usability" standard.  (Ex. 8F at 3–4).

Otten found 60 curb ramps with a slope exceeding the ADAAG requirement of 12.3 percent.  Of those, the City replaced eight curb ramps and contracted for new construction for another eighteen.  Darr and the City found that 24 of the curbs were not required to meet ADAAG requirements because those curbs were not part of the Spur 527 Traffic Mitigation Plan or were not pedestrian routes.  (Ex. 8F at 4–6).[10]  Darr determined that ten intersections

---

[9] Fairview at Brun (southeast/east corner), Fairview at Huldy (southwest corner), Fairview at Huldy (northeast/east corner), Greenbriar at Lexington (southeast corner), and Westheimer at Helena (northwest/west corner).  Darr indicated that several other intersections Otten indicated as "completely non-compliant" were outside the resurfacing project, but the City nevertheless installed (or planned to construct) new curb ramps at those corners.

[10] Certain curb ramps fell into more than one category, which is why this list cumulatively accounts for more than 60 curb ramps.

were subject to ADAAG requirements, yet had curb ramps that failed to meet those requirements:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Fairview | Elmen | Southwest/South |
| Fairview | Hazard | Southeast |
| Fairview | McDuffie | Northeast |
| Fairview | Woodhead | Northwest/North |
| Webster | Austin | Southeast |
| Webster | Bagby | Northeast/East |
| Webster | Brazos | Northwest/North |
| West Alabama | Mulberry | Northeast/North |
| West Alabama | Stanford | Southeast/East |
| West Alabama | Yoakum | Southwest/South |

Darr also conducted a "usability" analysis of these curb ramps, but, as discussed below, this analysis is irrelevant for corners subject to the specific ADAAG standards for altered facilities. On the current record, under the ADAAG standards, the City has not remedied the deficiencies with these curb ramps.

Otten identified three corners with curb ramps that lacked sufficient width, which ADAAG requires to ensure that a wheelchair will remain on the paved sidewalk and ramp. The deficient corners Otten listed were Greenbriar at Portsmouth, southwest corner; Greenbriar at Richmond, northwest corner; and Westheimer at Midlane, southeast corner. (Ex. 112 at 8). The City determined that the first corner was not altered by the Spur 527

Traffic Mitigation Plan. (Ex. 8F at 6). The City replaced the curb ramp at the northwest corner of Greenbriar at Richmond. (*Id.*). The City planned construction to repair transition problems at all three corners, but it is unclear whether this construction will remediate the width problem in the ramp at the southeast corner of Westheimer at Midlane. (*Id.*).

The biggest problem that Otten cited was the "transition problem" that Jones generally described as the "V problem" in her testimony. Otten found 210 ramps that failed to meet ADAAG requirements for transitions. Of those 210 corners, 83 were outside the scope of the ADAAG-triggering projects, meaning that the ramp was outside a pedestrian zone or part of a facility that was not "altered" by resurfacing, or both. Of the 127 remaining corners, the City has built or contracted to build 63 new curb ramps. The City also contracted for transition work to mitigate the problems with 31 of the existing curb ramps. Thirty-two of the 210 curb ramps identified as having a transition problem were in pedestrian routes and affected by the Spur 527 Traffic Mitigation Plan, but have neither been modified nor slated for modification:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Fairview | Elmen | Southwest/West |
| Fairview | Huldy | Northwest |
| Fairview | Huldy | Northeast/North |
| Fairview | Huldy | Southeast/North |
| Webster | Bagby | Southeast/South |
| Webster | Crawford | Southwest |
| Webster | Jackson | Southeast/South |

| Webster | LaBranch | Northwest/North |
| West Alabama | Dunlavy | Northwest |
| West Alabama | Dunlavy | Northeast |
| West Alabama | Dunlavy | Southeast |
| West Alabama | Eastside | Southeast |
| West Alabama | Garrott | Southeast/South |
| West Alabama | Graustark | Southwest/South |
| West Alabama | Jack | Southeast/South |
| West Alabama | Mandell | Northeast/North |
| West Alabama | Montrose | Northeast/North |
| West Alabama | Montrose | Northwest/North |
| West Alabama | Mount Vernon | Northeast/North |
| West Alabama | Mulberry | Northeast/East |
| West Alabama | Stanford | Northwest/North |
| West Alabama | Stanford | Northeast/North |
| West Alabama | Yoakum | Southeast/East |
| West Alabama | Yupon | Southeast/South |
| Westheimer | Buffalo Speedway | Southwest |
| Westheimer | Claremont | Northwest |
| Westheimer | Eastside | Southwest |
| Westheimer | Hazard | Southwest |
| Westheimer | Kirby | Northeast |
| Westheimer | Montrose | Southwest |
| Westheimer | Revere | Southeast |
| Westheimer | River Oaks Blvd. | Southwest |

| Westheimer | Stanford | Northwest |
|------------|----------|-----------|

The only corner Otten criticized as having an adjoining slope exceeding 5 percent, the southwest corner of West Alabama at Driscoll, was outside the Spur 527 Plan work. (Ex. 8F at 13).

Otten cited 43 corners that lacked a level landing sidewalk area at the top of the curb ramp. Darr testified, and included notations in her report, that there was no requirement that the top of a curb have a level landing. (Ex. 8F at 13–14, 16 (citing and discussing then-controlling ADAAG § 4.7). The City also claims that 12 of these corners are outside the scope of the Spur 527 Traffic Mitigation Plan. The City replaced or contracted to replace 9 of the 31 curb ramps within the covered area, meaning that 22 of the curb ramps lacking level landings have not been fixed or slated to be fixed. The ADA does not require the City to repair these 22 ramps; further analysis is unnecessary on this purported deficiency.

Otten listed five corners with curb ramps that have a cross-slope exceeding 2 percent: (1) Fairview at Elmen, northwest/west corner; (2) Westheimer at Dickey, northwest corner; (3) Westheimer at Larchmont, northeast corner; (4) Westheimer at Dunlavy, northeast corner; and (5) Westheimer at Kirby, southeast/south corner. (Ex. 112 at 14). The City introduced evidence showing that the first three curb ramps are at intersections that were not altered or affected by the Spur 527 Traffic Mitigation Plan resurfacing work. (Ex. 8F at 14). The City replaced the fourth curb ramp. The curb ramp at the northeast corner of Westheimer at Dunlavy was part of an altered facility but has not been repaired.

Otten listed seven corners with curb ramps having a slope over 11.3 percent.  The corners are: (1) Webster at Crawford (southeast corner); (2) West Alabama at Stanford (southeast corner, south); (3) West Alabama at Stanford (northeast corner, east); (4) Westheimer at Woodhead (northwest corner); (5) Westheimer at Yoakum (southwest corner, east); and (6) Westheimer at Greenbriar (southwest corner, south).  The seventh corner, Westheimer at Yoakum (southwest corner, north), is reported as having no ramp at all; the City has since installed a new ramp.  (Ex. 8F at 15).  The City introduced evidence that the Westheimer at Greenbriar corner is outside the covered area.  Three of the five remaining corners were slated for additional transition repair, but the City did not introduce evidence showing that the contracting work aimed at correcting the transition problem will mitigate the slope problem.  Neither of the West Alabama intersections are scheduled for transition repair.  After the evidentiary hearing, the City submitted evidence showing that a new curb cut and ramp had been built at the southwest corner, east, at Westheimer at Yoakum. (Docket Entry No. 134, Ex. A).  As discussed below, four corners should have been, but were not, made ADAAG-compliant.

Otten cited eight corners as lacking the requisite textured surface.  The City introduced evidence showing that five of the eight corners were outside the covered area. (Ex. 8F at 15).  Of the remaining corners, one of the corners, Westheimer at Woodhead (northeast corner, north), had already been slated for construction of a new curb ramp.  The City did not introduce any evidence of plans to mediate this deficiency in the two remaining

39

corners, Greenbriar at Norfolk (southwest corner), and Webster at Jackson (northeast corner, north).[11]

When Otten made his report, five corners were under construction, two of which are outside the covered area.[12] Since then, two of the corners—Westheimer at Hazard (northwest corner) and Westheimer at Lake (northwest corner)—have had new ramps installed and the last corner, Westheimer at Argonne (northeast corner), was slated for transition work to be completed in January 2006. (Ex. 8F at 15).

Reid Msnry, managing engineer for the construction branch of the engineering and construction division of the City's public works department, testified that there was no pedestrian route at the "T intersection" of Westheimer at Helena, Exhibit 113-18, or at West Alabama at Audley Street, Exhibit 113-1. (*Id.* at 434–35). Msnry also authenticated an exhibit listing all of the planned and completed curb cuts and ramps constructed in conjunction with the Spur 527 Traffic Mitigation Plan. (*Id.* at 438; Ex. 8F). Msnry testified that his office performed field reviews of existing curb ramps, looking both for ramps that would need to be reconstructed to meet the standards for altered facilities (because of the resurfacing project) and for ramps that had usability problems even if those ramps were not

---

[11] Darr's report indicates that TAS requires textured surfaces for new construction only, not existing construction. (Ex. 8F at 16). Accordingly, the City had no obligation to remedy this defect on existing corners, but was required to build ramps with textured surfaces for the corners within the overlay and resurfacing projects.

[12] Westheimer at Bellmeade (northwest corner) and Westheimer at Bellmeade (northeast corner) were listed as under construction but outside the two projects. The City has nevertheless replaced the curb ramps at these two corners since Otten made his report.

directly affected by street resurfacing.  (Docket Entry No. 123 at 439).  He also indicated

which of the curbs and ramps challenged by Jones were affected by street resurfacing.

Msnry submitted a chart detailing his evaluation of existing curb ramps within the

Spur 527 Traffic Mitigation Plan area.  He indicated that certain curb ramps had

"deteriorated" and needed repair or replacement.  (Docket Entry No. 123 at 440).  His report,

(Ex. 8F), listed the following curbs within the overlay area as deteriorated and/or having

transition problems:

| Street 1 | Street 2 | Corner | Status | Trans. Problem? | Deteriorated? | Construction Date[13] |
|----------|----------|--------|--------|-----------------|---------------|-----------------------|
| Fairview | Brun | SW/S | Existing | Y | N | 1/06 |
| Fairview | Elmen | SW/S | Existing | Y | N | 1/06 |
| Fairview | Hazard | SW (Clam) | New | Y | N | 1/06 |
| Fairview | Hazard | NE (Clam) | New | Y | N | 1/06 |
| Fairview | Hazard | NW (Clam) | New | Y | N | |
| Fairview | McDuffie | NE (Clam) | Existing | Y | N | 1/06 |
| Fairview | McDuffie | SE/N | Existing | Y | N | 1/06 |
| Fairview | Woodhead | SE/N | Existing | Y | N | 1/06 |
| Fairview | Woodhead | NW /N | New | Y | N | 1/06 |

---

[13] Msnry's report indicated up to two construction dates for each curb: a construction target date for
building new ramps and a "transition construction target date" for repairing transition problems on certain
curbs.  If a curb was being replaced entirely, the City did not establish a separate transition date.  For curbs
with two construction dates, the latest construction date is listed.

| Fairview | Woodhead | SW/S | New | Y | N | 1/06 |
|----------|----------|------|-----|---|---|------|
| Webster | Austin | SW (Clam) | New | Y | N | 1/06 |
| Webster | Austin | SE (Clam) | Existing | Y | N | 1/06 |
| Webster | Bagby | SE/E | Existing | Y | Y | 1/06 |
| Webster | Bagby | NE/E | Existing | Y | N | 1/06 |
| Webster | Brazos | SW/S | Existing | Y | N | 1/06 |
| Webster | Caroline | NW/N | New | Y | N | 1/06 |
| Webster | Chenevert | SW | No ramp | Y | N | 1/06 |
| Webster | Chenevert | SE | No ramp | Y | N | 1/06 |
| Webster | Crawford | NW (Clam) | Existing | Y | N | 1/06 |
| Webster | Crawford | SE/S | Existing | Y | N | 1/06 |
| Webster | Jackson | NW (Clam) | Existing | Y | N | 1/06 |
| Webster | La Branch | NE | Existing | Y | N | 1/06 |
| Webster | La Branch | SW/S | Existing | Y | N | 1/06 |
| Webster | La Branch | SE/S | Existing | Y | N | 1/06 |
| W. Alabama | Bute | SE/S | New | Y | N | 1/06 |
| W. Alabama | Eastside | NW (Clam) | Existing | Y | N | 1/06 |
| W. Alabama | Garrott | SW/S | Existing | Y | N | 1/06 |
| W. Alabama | Garrott | NE/N | Existing | Y | N | 1/06 |
| W. Alabama | Graustark | NE/N | New | Y | N | 1/06 |
| W. Alabama | Graustark | SE/S | New | Y | N | 1/06 |
| W. Alabama | Jack | SW/S | Existing | Y | N | 1/06 |

| W. Alabama | Mandell | SW/W | Existing | Y | N | 1/06 |
|---|---|---|---|---|---|---|
| W. Alabama | Mandell | SE/E | Existing | Y | N | 1/06 |
| W. Alabama | Mandell | SE/S | Existing | Y | N | 1/06 |
| W. Alabama | Mandell | NE/E | Existing | Y | N | 1/06 |
| W. Alabama | Mandell | NW/W | New | Y | N | 1/06 |
| W. Alabama | Montrose | SE/S | Existing | Y | N | 1/06 |
| W. Alabama | Mt. Vernon | NW/W | Existing | Y | N | 1/06 |
| W. Alabama | Mt. Vernon | NW/N | Existing | Y | N | 1/06 |
| W. Alabama | Mt. Vernon | NE/E | Existing | Y | N | 1/06 |
| W. Alabama | Mulberry | NW/N | Existing | Y | N | 1/06 |
| W. Alabama | Mulberry | NE/N | Existing | Y | N | 1/06 |
| W. Alabama | Mulberry | SW/S | Existing | Y | N | 1/06 |
| W. Alabama | Mulberry | SE (Clam) | Existing | Y | N | 1/06 |
| W. Alabama | Sackett | NE (Clam) | Existing | Y | N | 1/06 |
| W. Alabama | Timmons | NE (Clam) | New | Y | N | 1/06 |
| W. Alabama | Wesleyan | NW (Clam) | New | Y | N | 1/06 |
| W. Alabama | Yoakum | NE/N | Existing | Y | N | 1/06 |
| W. Alabama | Yoakum | SW/S | Existing | Y | N | 1/06 |
| W. Alabama | Yoakum | NW/W | Existing | Y | N | 1/06 |
| W. Alabama | Yoakum | NW/N | Existing | Y | N | 1/06 |
| W. Alabama | Yoakum | SE/S | Existing | Y | N | 1/06 |

| W. Alabama | Yupon | SW/S | New | Y | N | 1/06 |
|---|---|---|---|---|---|---|
| W. Alabama | Yupon | NE/E | Existing | Y | N | 1/06 |
| W. Alabama | Yupon | SE/E | Existing | Y | N | 1/06 |
| W. Alabama | Yupon | NW/W | Existing | Y | N | 1/06 |
| Westheimer | Argonne | NW (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Argonne | NE | New | Y | N | 1/06 |
| Westheimer | Common-wealth | SW/S (Clam) | New | Y | N | 1/06 |
| Westheimer | Common-wealth | SE/S | Existing | Y | N | 1/06 |
| Westheimer | Drexel | SE (Clam) | New | Y | N | 1/06 |
| Westheimer | Dunlavy | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Eastside | NW | New | Y | N | 1/06 |
| Westheimer | Eastside | NE | New | Y | N | 1/06 |
| Westheimer | Grant | NW/N | New | Y | N | 1/06 |
| Westheimer | Hazard | NE (Clam) | New | Y | N | 1/06 |
| Westheimer | Hazard | NW (Clam) | New | Y | N | 1/06 |
| Westheimer | Maconda | NE (Clam) | Existing | N | Y | |
| Westheimer | Mandell | SW/S (Clam) | New | Y | N | 1/06 |
| Westheimer | Mandell | NW/N | New | Y | N | 1/06 |
| Westheimer | Newman | SW | Existing | N | Y | 1/06 |

| Westheimer | Peckham | SE (Clam) | Existing | N | Y | 1/06 |
|---|---|---|---|---|---|---|
| Westheimer | Peckham | SW | Existing | N | Y | 1/06 |
| Westheimer | River Oaks | NE (Clam) | New | Y | N | 1/06 |
| Westheimer | Shepherd | SE | Existing | Y | N | 1/06 |
| Westheimer | Shepherd | NE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Shepherd | SW/W (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Stanford | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Taft | NE/E | Existing | Y | Y | 1/06 |
| Westheimer | Taft | SE (Clam) | Existing | Y | Y | 1/06 |
| Westheimer | Waugh | NE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Whitney | NE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Whitney | SW (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Whitney | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Willowick | NW (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Willowick | NE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Woodhead | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Woodhead | SW (Clam) | Existing | N | Y | |

| Westheimer | Woodhead | NE (Clam) | Existing | Y | Y | 1/06 |
|---|---|---|---|---|---|---|
| Westheimer | Woodhead | NE/N | Existing | Y | Y | 1/06 |
| Westheimer | Yoakum | SW/N | New | Y | N | 1/06 |
| Westheimer | Yupon | SE/S | Existing | Y | N | 1/06 |

The report also included a list of ramps outside the area of the Spur 527 Traffic Mitigation Plan street resurfacing work that Msnry found to be deteriorated and/or having transition problems and that the City was reconstructing:

| Street 1 | Street 2 | Corner | Status | Transition Problem? | Deteriorated? | Construction Date[14] |
|---|---|---|---|---|---|---|
| Fairview | Brun | SE/E | Existing | Y | N | 1/06 |
| Fairview | Brun | SW/W | Existing | Y | N | 1/06 |
| Fairview | Brun | NE/E | Existing | Y | N | 1/06 |
| Fairview | Driscoll | NW/W | Existing | Y | Y | 1/06 |
| Fairview | Driscoll | SW/W | Existing | Y | N | 1/06 |
| Fairview | Elmen | SW/W | Existing | Y | N | 1/06 |
| Fairview | Huldy | SW/E | Existing | Y | N | 1/06 |
| Fairview | Huldy | NE/E | Existing | Y | N | 1/06 |
| Fairview | Morse | NE/E | Existing | Y | N | 1/06 |
| Greenbriar | Lexington | SE | Existing | N | Y | |
| Greenbriar | Portsmouth | SW | Existing | Y | N | 1/06 |

---

[14] Msnry's report indicated up to two construction dates for each curb: a construction target date for building new ramps and a "transition construction target date" for repairing transition problems on certain curbs. If a curb was being replaced entirely, the City did not establish a separate transition date. For curbs with two construction dates, the latest construction date is listed.

| Greenbriar | Portsmouth | NW (Clam) | Existing | Y | N | 1/06 |
|---|---|---|---|---|---|---|
| Greenbriar | Richmond | NW (Clam) | New | Y | N | 1/06 |
| Webster | Brazos | NW/W | Existing | Y | N | 1/06 |
| Webster | Brazos | SE/E | Existing | Y | N | 1/06 |
| Webster | Caroline | NW/W | New | Y | N | 1/06 |
| Webster | Jackson | NE/E | Existing | Y | N | 1/06 |
| Webster | La Branch | NW/W | Existing | Y | N | 1/06 |
| W. Alabama | Garrott | NW/W | New | Y | N | 1/06 |
| W. Alabama | Garrott | SW/W | Existing | Y | N | 1/06 |
| W. Alabama | Garrott | NE/E | Existing | Y | N | 1/06 |
| W. Alabama | Graustark | NE/E | New | Y | N | 1/06 |
| W. Alabama | Greeley | SE | Existing | Y | N | 1/06 |
| W. Alabama | Montrose | SE/E | Existing | Y | N | 1/06 |
| W. Alabama | Sackett | SE | Existing | Y | N | 1/06 |
| Westheimer | Bellmeade | NE | New | Y | N | 1/06 |
| Westheimer | Brun | NW | Existing | N | Y | |
| Westheimer | California | NE | Existing | Y | N | 1/06 |
| Westheimer | Driscoll | NW | Existing | Y | Y | 1/06 |
| Westheimer | Driscoll | NE | Existing | Y | Y | 1/06 |
| Westheimer | Ferndale | SW (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Ferndale | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Greenbriar | SW/W | Existing | Y | N | 1/06 |
| Westheimer | Huldy | NE | Existing | Y | N | 1/06 |

47

| Westheimer | Huldy | NW | Existing | N | Y | |
|---|---|---|---|---|---|---|
| Westheimer | Kuester | NE | Existing | Y | Y | 1/06 |
| Westheimer | Lincoln | NE | Existing | N | Y | |
| Westheimer | Lincoln | NW | Existing | N | Y | |
| Westheimer | McDuffie | NE | Existing | N | Y | |
| Westheimer | Persa | SE | Existing | Y | Y | 1/06 |
| Westheimer | Ridgewood | NE | Existing | Y | N | 1/06 |
| Westheimer | Sackett | SE (Clam) | New | Y | N | 1/06 |
| Westheimer | Sackett | SW | Existing | Y | N | 1/06 |
| Westheimer | Stanford | SW/W | Existing | Y | N | 1/06 |
| Westheimer | Suffolk | SE (Clam) | Existing | Y | N | 1/06 |
| Westheimer | Woodhead | NE/E | Existing | Y | Y | 1/06 |
| Westheimer | Yupon | NE | Existing | Y | Y | 1/06 |
| Westheimer | Yupon | NW | Existing | Y | N | 1/06 |

Msnry also testified about Houston City Council action authorizing completion of certain construction work.  (Docket Entry No. 123 at 449; Ex. 4).  This $6 million contract included construction of curb cuts and ramps and repair of certain existing curbs.  Msnry testified that the City has constructed 179 ramps at 65 different intersections within the 527 Traffic Mitigation Plan area.  (Docket Entry No. 123 at 458–59).  He clarified that 93 of the ramps are new—meaning that no curb cut or ramp existed before the project—and 86 of the ramps were existing ramps that the City reconstructed.  (*Id.* at 460).  Msnry testified that the

existing ramps were reconstructed to comply with ADAAG after the City resurfaced the street if they failed to meet the City's "usability" criteria.

### B.    The Evidence as to METRO

Jones significantly limited her complaints about METRO-installed traffic poles. Jones's METRO/RCTCS-related testimony related to the following three intersections: (1) San Felipe at Voss; (2) Kirby at North Braeswood; and (3) Stanford at Alabama.  (*See* Docket Entry No. 121 at 131–32).  Otten's reports distinguish between problems for which the City is allegedly responsible and problems for which METRO is allegedly responsible.

Eugene Smith testified for METRO.  In testifying about crosswalk signals, Smith stated that pushing the button for crossing the street sometimes causes a walk signal to appear faster or stay longer in duration, and sometimes has no material effect.  (Docket Entry No. 125 at 693–94).  In some corners, the button will cause a walk signal to appear, but does not affect the duration of the green light.  Smith testified that regardless of whether the button is pushed, "the duration [of the wait and the walk signal] likely would be the same." (*Id.* at 695).  Smith also testified that in some cases pushing the signal button will cause the walk signal to appear 15 to 20 seconds sooner.  (*Id.* at 698).  Smith provided additional testimony about the RCTCS project, emphasizing that most of the installation of new poles was done years ago and that other construction at most sites has since taken place.  Notably, Smith testified that in evaluating curbs and ramps on the list of complaints that Jones submitted, METRO had not installed a new traffic signal pole in the sidewalk adjacent to a single one of the ramps.  (*Id.* at 729).

49

III.    **Analysis of the Claims against the City**

A.    **The City's Obligation to Repair or Modify Previously Built Curb  Ramps When a Street is Resurfaced from Intersection to Intersection**

This court asked for additional briefing about the City's obligation to modify or repair existing curb ramps at intersections of streets that are resurfaced and in a pedestrian walkway, if those ramps do not comply with the ADA requirements for new or altered construction, but which the City contends are nonetheless "usable."  The City argues that it has no duty under to improve previously built curb ramps that are not in compliance with the applicable regulations for new construction or altered facilities.  Instead, the regulations governing existing facilities control.  These regulations require that the public entity operate each service, program, or activity so that such program "when viewed in its entirety is readily accessible to and usable by individuals with disabilities."  28 C.F.R. § 35.150.

Jones offers several grounds to support her argument that the new construction or altered facility standard established in 28 C.F.R. § 35.151 applies to curb ramps when the City alters the street by resurfacing it from intersection to intersection.  Jones argues that this court has already ruled that the existing curb ramps serving a resurfaced street must comply with the ADA requirements for altered facilities because the intersections and crosswalks are part of the altered facility.  Jones argues that  reliance on subjective "usability" standards under 28 C.F.R. § 35.150 to measure ADA compliance of existing curb ramps permits the City to flout ADA requirements, maintain existing barriers to access, and discriminate against the disabled.

50

The second argument, standing alone, is not persuasive.  Congress and the Department of Justice distinguished between the ADA compliance requirements for curb ramps that are part of existing facilities and ADA compliance requirements for curb ramps that are part of newly constructed or altered facilities.  The issue is whether resurfacing a street is an alteration that requires the City not only to install curb cuts and ramps where they are absent, but to repair or modify previously built ramps if they did not comply with ADAAG and TAS standards when built or have deteriorated into noncompliance, even if they are "usable."  A related issue is the number of ramps that are required in an intersection.

A typical intersection of two streets (with one street running north-south and one street running east-west), presents several ramp/curb cut options.  Curb cuts and ramps may be installed going each direction at each corner (one ramp to traverse the east-west street and one ramp to traverse the north-south street), for a total of eight curb cut/ramp combinations per intersection.  Four "clamshell" ramps, which provide access to both directions of traffic through a single, wide ramp that is placed each corner, can be used.  Some combination of both can also be used.  ADAAG and TAS allow these combinations and imposes requirements for each.

Jones argues that street resurfacing is an "alteration" triggering the City's obligations under the ADA with respect to an entire intersection, including up to eight curb cuts and ramps.  Under this approach, the City would have to install or modify curb ramps at each corner, in each direction, even if the resurfacing work does not affect the entire intersection, and all of those ramps would have to meet the ADAAG standards for altered facilities.  The

City argues that if a curb ramp is in place in the intersection, street resurfacing does not trigger a requirement to modify or repair that ramp if it is usable, even if it does not meet ADA requirements for altered facilities.  The City also argues that it need not put a curb ramp in both directions at each corner.  Neither side is wholly correct.

This court has found that if a street is resurfaced from intersection to intersection, it is an altered facility and the City is required to make the altered parts of the facility compliant under the stringent § 35.151(b) and (e) standards.  The curb that is part of the resurfaced street must have a curb cut and ramp that meet the requirements for new construction and altered facilities.  That means that if a street is resurfaced, the existing curb ramps on the resurfaced street, that are part of the altered facility, must be brought into compliance with the ADAAG requirements.  The ADA requirements for altered facilities apply because the curb cuts and curb ramps at the portions of corners directly affected by street resurfacing are part of the resurfaced street.  *Accord Kinney*, 9 F.3d at 1073; *Ability Ctr. of Greater Toledo*, 133 F. Supp. 2d at 591–92; *Deck*, 76 F. Supp. 2d at 822; 28 C.F.R. § 35.151(e).  Different standards apply to preexisting curb cuts and ramps that are not part of the altered facility because the resurfacing work on the street does not extend to or affect those cuts and ramps.  Such curb cuts and ramps need not be modified or repaired when a cross-street is resurfaced, even if they do not fully comply with the ADA standards for newly constructed or altered curb ramps.  These curb ramps are governed by § 35.150, the standards for existing facilities.  Absent an alteration such as street resurfacing that affects an existing curb or ramp, that curb and ramp must meet the "usability" standard, not ADAAG or TAS requirements.  This court

52

finds that the newly adopted City policy establishing specific criteria for determining whether existing curb ramps are "usable" is a reasonable and objective way of measuring accessibility under this standard.

This approach to whether existing curb ramps must be modified and, if so, under what standard, is consistent with the testimony of the City's accessibility consultant and expert witness, Teresa Darr.  She testified that if there are pedestrian crossings at intersections that are on resurfaced streets, the City must have ADAAG-compliant curb ramps on those intersections.  Section 35.151(b) and (e) apply.  (Docket Entry No. 122 at 406–08).  Darr also explained that "existing curb ramps which could . . . not serve pedestrian crossings on the altered streets are not required to be altered or brought into compliance as a result of the street overlay project."  (*Id.*; *see also* Ex. 8 at 12).  But if the curb is on an intersection in a pedestrian crossing on a resurfaced street, the existing curb ramps must be altered to meet ADAAG standards.

This approach also affects the number of curb ramps that must be built to ADA compliance if a street is resurfaced.  Curb ramps serving the portion of the intersection on a cross-street that is not resurfaced are not part of the altered facility under § 35.151.  If, for example, a north-south street is resurfaced but the intersecting east-west street is not, the City must bring the curb ramps serving the pedestrian crossings on the resurfaced street—namely, the curb cuts and ramps (or places where such facilities should exist) on the north-south street—into ADA compliance.  The standards for compliance are set by § 35.151(e), the standards for altered facilities.  The City is not required to modify existing curb cuts and

53

ramps on the intersecting east-west street as part of the resurfacing work, because those cuts and ramps are not part of the altered facility, unless those ramps are not usable.  The "usability" standard under § 35.150 applies to the existing curb ramps that are in a pedestrian route but not part of the altered, resurfaced street.  This includes curb ramps that are on cross-streets that were not resurfaced under the Spur 527 Traffic Mitigation Plan.

Jones argues that because the City has not shown that all of the challenged curb ramps were built before, and not altered after, the ADA's effective date of January 26, 1992, the "existing facilities" standard of § 35.150 cannot apply to any of the curb ramps.  (Docket Entry No. 127 at 1).  Jones argues that under Rule 301 of the Federal Rules of Evidence, the City has the burden of proving that the curb ramps not affected by street resurfacing were built before the ADA's 1992 effective date and not altered after that date.  This argument is not persuasive.  Jones has the burden of proving that the challenged facilities were built after 1992 or that these facilities were not altered after 1992 in a way that requires the City now—long after any such alterations were completed—to bring the curb ramps into compliance with ADA standards that govern newly constructed or altered facilities.  She has had two evidentiary hearings and significant discovery, but submits only part of an Internet print-out in support of her claim that certain curbs outside the Spur 527 Traffic Mitigation Plan were altered by street overlays in 1996.  This evidence is insufficient to require the City to modify or repair existing all curb ramps to ensure compliance with the ADA standards under § 35.151(e).

54

The City also argues that it has no obligation to install curb cuts and ramps in places that are not "pedestrian routes," or to modify existing ramps in such places to meet ADAAG standards, even if such places are on streets that have been resurfaced. (Docket Entry No. 135 at 14–15). Jones responds that the City has no objective basis for defining a nonpedestrian route. (Docket Entry No. 127 at 32–34). The City relies on the language of the regulations:

> (1) newly constructed or altered streets, roads and highways must contain curb ramps or other sloped areas at any intersection having curbs or other barriers to entry from a *street level walkway*;
> (2) newly constructed or altered *street level pedestrian walkways* must contain curb ramps or other sloped areas at intersections to streets, roads, or highways.

28 C.F.R. § 35.151(e)(1)–(2) (emphasis added).

The regulatory language presupposes that a "street level pedestrian walkway" before ADAAG-compliant curb cuts and ramps are required.[15] The pedestrian route status is determined by City officials. If no pedestrian route exists, the City has no obligation to provide ADA-compliant access. As the City's expert, Teresa Darr, pointed out, the ADA does not affect municipal officials' discretion to limit or discourage pedestrian traffic in certain areas. This court agrees with the City that municipal government decisions to

---

[15] Darr testified that she had multiple conversations with Department of Justice Technical Assistance Line, which connected her with ADA compliance personnel who agreed with this approach. Additionally, the DOJ representatives with whom Darr spoke stated that, in analyzing an altered street, the first step is to determine if a pedestrian route exists. (Docket Entry No. 122 at 406). According to Darr, the DOJ Technical Assistance Information Line provides formal guidance to the public, including businesses, state and local governments, and individuals, on questions concerning the ADA. (Ex. 8 at 11).

discourage pedestrian traffic in specific areas for safety reasons are not superseded by the ADA.

**B.     Application**

As an initial matter, this court rejects the City's apparent "failure to exhaust administrative remedies" defense.  The City elicited testimony about Jones's PAR request at the evidentiary hearing and throughout these proceedings.  The ADA does not have an exhaustion requirement.  The record shows that Jones has attempted to resolve her concerns with the City on multiple occasions.  To the extent the City seeks a negative inference against Jones for these efforts, that request is denied.  The City's work on certain curb ramps in response to Jones's PAR request is taken into account in determining whether the City has complied with its ADA obligations.

The curb cuts and ramps at issue can be placed into three categories:  (1) those in places that were part of an altered facility—streets resurfaced in the Spur 527 Traffic Mitigation Plan—and in a pedestrian walkway; (2) those existing curb cuts and ramps that are not affected by or part of the street resurfacing; and (3) those curb cuts and ramps that are not in a pedestrian walkway.  As to the first category, the City was required to install or repair curb cuts and ramps that met the standards under § 35.151(b) and (e) in connection with the street resurfacing work.  The City's failure to do so at the time of the resurfacing is a violation of the ADA and the continued failure to do so is a continuing ADA violation. The second category is subject to the subjective "usability" standard for existing ramps and

56

curbs.  For the third category, corners not in a pedestrian walkway, the City had no obligation to bring the curbs and ramps into ADA compliance.

### 1.      *Curbs and Ramps that Must Meet § 35.151 Requirements*

Turning to the first category of curb cuts and ramps, those subject to ADAAG and TAS requirements, this court finds that the following intersections have curb cuts and ramps, but they fail to meet those requirements.  The record shows that the City has not and does not intend to repair or rebuild these ramps.  These curb cuts and ramps must be repaired and, if necessary, rebuilt to comply with ADAAG.

| Street 1 | Street 2 | Corner |
|---|---|---|
| Fairview | Elmen | Southwest/South |
| Fairview | Hazard | Southeast |
| Fairview | Huldy | Northwest |
| Fairview | Huldy | Northeast/North |
| Fairview | Huldy | Southeast/North |
| Fairview | McDuffie | Northeast |
| Fairview | Woodhead | Northwest/North |
| Greenbriar | Norfolk | Southwest |
| Webster | Austin | Southeast |
| Webster | Bagby | Northeast/East |
| Webster | Brazos | Northwest/North |
| Webster | Crawford | Southwest |
| Webster | Crawford | Southeast |
| Webster | Jackson | Northeast/North |

| Webster | LaBranch | Southwest/South |
|---|---|---|
| West Alabama | Dunlavy | Northwest |
| West Alabama | Dunlavy | Northeast |
| West Alabama | Dunlavy | Southeast |
| West Alabama | Eastside | Southeast |
| West Alabama | Garrott | Southeast/South |
| West Alabama | Jack | Southeast/South |
| West Alabama | Mandell | Northeast/North |
| West Alabama | Montrose | Northeast/North |
| West Alabama | Mt. Vernon | Northeast/North |
| West Alabama | Mulberry | Northeast/East |
| West Alabama | Mulberry | Northeast/North |
| West Alabama | Stanford | Northwest/North |
| West Alabama | Stanford | Northeast/East |
| West Alabama | Stanford | Southeast/South |
| West Alabama | Stanford | Southeast/East |
| West Alabama | Yoakum | Southwest/South |
| Westheimer | Midlane | Southeast |
| Westheimer | Dunlavy | Northeast |
| Westheimer | Yoakum | Southwest/East |

This court has rejected the City's argument that these ramps should be evaluated under the less stringent "usability" standard of § 35.150. These ramps are part of the altered facility and must comply with §35.151 requirements.

The City has also raised arguments at to specific locations. For example, the City slated Westheimer at Woodhead, northwest corner, and Westheimer at Yoakum, southwest corner (east), for transition repairs. The evidence shows that these ramps have slopes that exceed those permitted under ADAAG. The transition repairs will not remedy the excessive slope problem. Additional work on these ramps must be performed to comply with the applicable ADAAG requirements for altered construction. For the ramp at Webster at Brazos, northwest corner north, the City's defense that TAS requires a textured surface only for new, but not existing, construction does not respond to the court's findings that the altered-facilities standard applies and that this ramp has other deficiencies under those standards. As noted above, this court agrees with the City that § 35.151 does not require a level landing at the top of curb ramps.

With respect to each of these corners, Jones has met the requirements for a permanent injunction. These corners have curb ramps but they do not meet applicable ADA standards for altered facilities.[16] Failure to grant this injunction will result in irreparable injury to Jones, who is unable to traverse certain City streets and sidewalks because of these noncompliant ramps and curbs. The damage to Jones from a continuing ADA violation by the City outweighs the cost to the City to bring these intersections into compliance. A permanent injunction in Jones's favor will not disserve the public interest; rather, the

---

[16] This court further finds that these are not corners that were originally ADA-compliant but later deteriorated; to the extent such a standard exists, it need not be applied here. These corners have never been fully compliant with altered facilities requirements and must be brought into compliance by the City.

injunction will effectively serve the public interest by bringing curb ramps on altered City streets into compliance with the ADA and making City streets more accessible to disabled citizens.

The parties are to provide the court a separate proposed order of injunction requiring the City to repair these curbs and ramps to bring them into compliance including specific timetables for accepting bids, signing contracts, commissioning the work, and completing and inspecting the work.

This court does not grant Jones's request for an injunction to build additional new curb cuts and ramps in places where none existed, beyond those the City has already built or is committed to build. The City identified a number of corners that do not have curb cuts or ramps within the Spur 527 Mitigation Plan, on streets that were resurfaced, that are in pedestrian routes.[17]  The City has either built ramps in these areas or committed to do so, under ADAAG and TAS standards.  Further relief is not necessary to achieve ADA compliance.

### 2.    *Existing Curbs and Ramps Subject to the Usability Standard*

This court has found that existing curbs and ramps that are not part of the altered – resurfaced – streets are subject to the § 35.150 "usability" standard.  This court has also found that the City has established, albeit belatedly, an appropriate standard for "usability" that applies to existing curb ramps:

---

[17] These curb ramps are listed in Appendix A to this opinion.

| Existing Curb Ramp Component | Criteria | Description |
|---|---|---|
| Clear Width | Min. 32 inches | Clear width of curb ramp in the direction of travel |
| Running slope | Max. 12.5 percent to 16 percent | Curb ramp slopes up to 12.5 percent are considered usable and for short distances of 2 feet, 16 percent is usable |
| Cross slope | Max. 6 percent | Cross-slope of curb ramp |
| Horizontal Faulting/Cracking | Max. 1 inch | Faulting and cracking in the horizontal |
| Change in level | Max. 3/4 inch | Vertical change in level |
| Change of Grade | Max. 19 percent | Difference between the combined grade of two adjacent surfaces |
| Surface | Stable and firm | The surface should be stable, firm, and slip resistant |

(Docket Entry No. 134, Ex. B at 3).

These criteria refer to ADAAG and TAS standards and are a result of the review that Teresa Darr performed in her work on this case, as well as the field analysis and collective efforts of the City Public Works Department.  Jones did not introduce a competing "usability" standard.  Otten, Jones's expert, conceded that the standard for existing curb cuts and ramps is usability—but did not attempt to define the standard, instead relying wholly on the ADAAG and TAS standards.  The City's criteria are less stringent than the ADAAG and TAS requirements but provide a specific, reasonable, and objective guideline for measuring "usability," examining the different circumstances and factors that affect "reasonable

accessibility" viewed as a whole.  This court has found that the City's policy adopting these accessibility standards for "usability" of existing facilities is reasonable.

With respect to the curb ramps that are not part of the Spur 527 Traffic Mitigation Plan street resurfacing work, this court agrees with the City that the ADAAG and TAS requirements for new or altered construction do not apply.  The "usability" standard applies to the following ramps and curbs:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Fairview | Brun | Northwest/West |
| Fairview | Brun | Southeast/East |
| Fairview | Brun | Northeast/East |
| Fairview | Brun | Southwest/West |
| Fairview | Driscoll | Northeast/North |
| Fairview | Driscoll | Northwest/West |
| Fairview | Driscoll | Southwest/West |
| Fairview | Dunlavy | Southeast |
| Fairview | Elmen | Northeast/East |
| Fairview | Elmen | Northwest/West |
| Fairview | Elmen | Southeast/East |
| Fairview | Elmen | Southwest/West |
| Fairview | Huldy | Southwest |
| Fairview | Huldy | Northeast/East |
| Fairview | Morse | Southeast |
| Fairview | Park Avenue | Northeast/East |
| Fairview | Park Avenue | Northwest/West |

| Fairview | Park Avenue | Southeast/East |
| Fairview | Park Avenue | Southwest/West |
| Fairview | Morse | Northeast |
| Fairview | Morse | Northwest/East |
| Fairview | South Shepherd | Northeast/East |
| Fairview | Woodhead | Northeast/East |
| Fairview | Woodhead | Southeast/East |
| Greenbriar | Norfolk | Northwest |
| Greenbriar | Lexington | Northeast |
| Greenbriar | Lexington | Southeast |
| Greenbriar | Portsmouth | Northwest |
| Greenbriar | Portsmouth | Southwest |
| Greenbriar | Richmond | Southwest |
| Richmond | Eastside | Southwest |
| Richmond | Eastside | Northeast |
| Richmond | Eastside | Northwest |
| Webster | Brazos | Northwest/West |
| Webster | Caroline | Northwest/West |
| Westheimer | Sackett | Southeast |
| Westheimer | Helena | Northwest/West |
| West Alabama | Graustark | Southeast/East |
| West Alabama | Greeley | Southeast |
| West Alabama | Greeley | Southwest |
| West Alabama | Jack | Southwest/West |
| West Alabama | Jack | Southeast/East |

| West Alabama | Montrose | Southeast/East |
|---|---|---|
| Westheimer | Mount Vernon | Southeast |
| Westheimer | Taft | Northeast/East |
| Westheimer | Yupon | Southwest/West |
| Westheimer | Yupon | Northeast/East |
| Webster | Brazos | Southwest/West |
| Webster | Brazos | Southeast/East |
| Webster | Brazos | Northeast/East |
| Webster | Caroline | Southwest/West |
| Webster | Caroline | Southeast/East |
| West Alabama | Driscoll | Southwest/West |
| West Alabama | Day | Southwest |
| Webster | Jackson | Southeast/East |
| Webster | Jackson | Northeast/East |
| Webster | LaBranch | Northwest/West |
| Webster | LaBranch | Southwest/West |
| Webster | LaBranch | Southeast/East |
| Webster | Louisiana | Northeast |
| Webster | Louisiana | Southwest |
| West Alabama | Flora | Northwest/West |
| West Alabama | Flora | Northeast/East |
| West Alabama | Garrott | Northwest/West |
| West Alabama | Garrott | Northeast/East |
| West Alabama | Graustark | Northwest/West |
| West Alabama | Graustark | Northeast/East |

| West Alabama | Graustark | Southwest/West |
| West Alabama | McDuffie | Southwest |
| West Alabama | Montrose | Northwest/West |
| West Alabama | Montrose | Northeast/East |
| West Alabama | Mulberry | Southeast/East |
| West Alabama | Revere | Northeast/East |
| West Alabama | Roseland | Southeast/East |
| West Alabama | Roseland | Northeast/East |
| West Alabama | Roseland | Northwest/West |
| Westheimer | Bellmeade | Northeast |
| Westheimer | Bellmeade | Northwest |
| Westheimer | Brun | Northwest |
| Westheimer | California | Northeast |
| Westheimer | California | Northwest |
| Westheimer | Commonwealth | Northeast/East |
| Westheimer | Commonwealth | Northwest/West |
| Westheimer | Commonwealth | Southeast/East |
| Westheimer | Commonwealth | Southwest/West |
| Westheimer | Helena | Northeast/East |
| Westheimer | Larchmont | Northeast |
| Westheimer | Larchmont | Northwest |
| Westheimer | Mandell | Northwest/West |
| Westheimer | Mandell | Southwest/West |
| Westheimer | Mount Vernon | Southwest |
| Westheimer | Persa | Southeast |

| Westheimer | Sackett | Southwest |
| Westheimer | Stanford | Southwest/West |
| Westheimer | Suffolk | Southeast |
| Westheimer | Taft | Southwest/West |
| Westheimer | Waughcrest | Northwest |
| Westheimer | Windsor | Northeast |
| Westheimer | Windsor | Northwest |
| Westheimer | Woodhead | Northeast/East |
| Westheimer | Yupon | Southeast/East |

The City has found unusable and replaced the existing curb ramps with ADAAG- and

TAS-compliant ramps at the following intersections:

| Street 1 | Street 2 | Corner |
|---|---|---|
| Fairview | Brun | Northwest/West |
| Fairview | Elmen | Southeast/East |
| Fairview | Driscoll | Northeast/East |
| Fairview | Morse | Northwest/East |
| Fairview | Morse | Northeast |
| Fairview | Park Avenue | Northeast/East |
| Fairview | Park Avenue | Northwest/West |
| Fairview | Park Avenue | Southeast/East |
| Fairview | Park Avenue | Southwest/West |
| Greenbriar | Richmond | Southwest |
| Webster | Caroline | Northwest/West |
| West Alabama | Graustark | Southeast/East |

66

| | | |
|---|---|---|
| West Alabama | Montrose | Southeast/East |
| West Alabama | Flora | Northwest/West |
| West Alabama | Flora | Northeast/East |
| West Alabama | Garrott | Northwest/West |
| West Alabama | Graustark | Northwest/West |
| West Alabama | Graustark | Northeast/East |
| West Alabama | Graustark | Southwest/West |
| West Alabama | Revere | Northeast/East |
| West Alabama | Roseland | Southeast/East |
| West Alabama | Roseland | Northeast/East |
| West Alabama | Roseland | Northwest/West |
| Westheimer | California | Northwest |
| Westheimer | Commonwealth | Southwest/West |
| Westheimer | Commonwealth | Northwest/West |
| Westheimer | Commonwealth | Northeast/East |
| Westheimer | Mount Vernon | Southwest |
| Westheimer | Sackett | Southeast |
| Westheimer | Suffolk | Southeast |
| Westheimer | Waughcrest | Northwest |
| Westheimer | Windsor | Northeast |
| Westheimer | Windsor | Northwest |
| Westheimer | Woodhead | Northeast/East |
| Westheimer | Bellmeade | Northeast |
| Westheimer | Bellmeade | Northwest |

Because these ramps were replaced with ADAAG-compliant ramps, the City has met its legal obligation.

The evidence shows that the City, albeit belatedly and because of this lawsuit, has reviewed the existing intersections about which Jones registered complaints and has repaired, rebuilt, or slated for construction the corners that are not "usable." Jones has not presented evidence showing that a specific curb ramp that the City deemed "usable" is, in fact, unusable. Jones has not shown that an existing curb ramp that fails to meet the City's "usability" standard has not been corrected or slated for correction. No permanent injunction is warranted for existing curb ramps that are subject to the usability standard under § 35.150.

### 3. Corners that Are Not in a Pedestrian Walkway

The ADA requirements do not apply to a curb that is not in a pedestrian route. Jones complains that the City belatedly attached the "no pedestrian zone" label to certain areas to avoid ADA compliance. The evidence does not support this conclusion. The evidence shows that the corners the City has designated as in "no pedestrian zones" are limited to areas where the City wants to discourage or prohibit pedestrian access. The City's witnesses were credible on this issue. The significant data and documentation as to these areas do not indicate overreaching or after-the-fact determinations by the City. The corners outside a pedestrian route are:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Webster | Chenevert | Northeast |
| Webster | Chenevert | Northwest |

| Webster | Chenevert | Southwest |
|---------|-----------|-----------|
| Webster | Chenevert | Southeast |
| West Alabama | Brandt | Southwest |
| West Alabama | Brandt | Southeast |
| West Alabama | Bute | Southwest |
| West Alabama | Bute | Southeast/East |
| West Alabama | Huldy | Northeast |
| West Alabama | Huldy | Northwest |
| Westheimer | Brun | Northeast |
| Westheimer | Crocker | Northwest |
| Westheimer | Crocker | Northeast |
| Westheimer | Dickey | Northwest |
| Westheimer | Driscoll | Northwest |
| Westheimer | Eastgrove | Southeast |
| Westheimer | Eastside | Northwest |
| Westheimer | Eastside | Northeast |
| Westheimer | Elmen | Northeast |
| Westheimer | Elmen | Northwest |
| Westheimer | Ferndale | Southeast |
| Westheimer | Ferndale | Southwest |
| Westheimer | Graustark | Southeast |
| Westheimer | Graustark | Southwest |
| Westheimer | Greenbriar | Southwest/West |
| Westheimer | Greenbriar | Southeast |
| Westheimer | Greenbriar | Southwest/South |

| Westheimer | Huldy | Northeast |
| Westheimer | Huldy | Northwest |
| Westheimer | Kuester | Northeast |
| Westheimer | Lincoln | Northeast |
| Westheimer | Lincoln | Northwest |
| Westheimer | McDuffie | Northeast/North |
| Westheimer | McDuffie | Northwest |
| Westheimer | Morse | Northeast |
| Westheimer | Morse | Northwest |
| Westheimer | Mulberry | Southwest |
| Westheimer | Mulberry | Northwest |
| Westheimer | Park | Northeast |
| Westheimer | Park | Northwest |
| Westheimer | Persa | Southwest |
| Westheimer | Ralph | Northwest |
| Westheimer | Timmons | Southwest |
| Westheimer | Virginia | Southeast |
| Westheimer | Westcreek | Northeast |
| Westheimer | Westcreek | Northwest/West |
| Westheimer | Westcreek | Northwest/North |

Additionally, the City installed new curb ramps, which were ADAAG-compliant, at the following intersections, even while asserting that there was no legal requirement to do so:

| Street 1 | Street 2 | Corner |
|---|---|---|
| Webster | Chenevert | Northwest |
| Westheimer | Eastside | Northwest |
| Westheimer | Eastside | Northeast |
| Westheimer | Elmen | Northeast |
| Westheimer | Elmen | Northwest |
| Westheimer | Graustark | Southwest |
| Westheimer | Park | Northwest |

Applying the City's usability criteria, Darr concluded that the following non-pedestrian route corners had "usable" existing curb ramps:

| Street 1 | Street 2 | Corner |
|---|---|---|
| Westheimer | Park | Northeast |
| Westheimer | Westcreek | Northeast |
| Westheimer | Westcreek | Northwest/West |
| Westheimer | Westcreek | Northwest/North |

Darr concluded that 48 corners were not in pedestrian routes. Of those 48 corners, the City nevertheless constructed 7 new, ADAAG-compliant curb ramps and Darr concluded that another 4 corners were "usable" under the City's usability criteria.

Jones has not shown a basis for an injunction as to corners that are not in a pedestrian route.

> 4. *Ramps Not in the City's Jurisdiction*

71

Some of the corners Jones identified as noncompliant are on land that the evidence shows is controlled by the Texas Department of Transportation (TXDOT), not the City. The following corners fall into this category:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Greenbriar | US 59 | NE under freeway |
| Greenbriar | US 59 | NW under freeway |
| Greenbriar | US 59 | SE |
| Greenbriar | US 59 | SE under freeway |
| Greenbriar | US 59 | SW |
| Greenbriar | US 59 | SW under freeway |
| Greenbriar | US 59 | NE |

The City has no duty to install or maintain ADA-compliant curb cuts and ramps at these corners. TXDOT is not a party to this lawsuit. Jones has not shown a basis for an injunction as to the curb cuts and ramps at these corners.

## V.   The Claims against METRO

METRO contends that most of Jones's claims are moot or that the evidence has shown the claims to be untimely under the statute of limitations. (Docket Entry No. 132 at 10–12). Jones responds that this court's previous Memorandum and Order rejected these arguments. (Docket Entry No. 133 at 2–5). In the September 29, 2004 Memorandum and Order, this court determined that Jones had sufficiently alleged a continuing violation so to avoid METRO's statute of limitations defense. (Docket Entry No. 64 at 22–23, 28–29). This

ruling, which in part denied the defendants' motions to dismiss, did not prevent METRO from reurging this defense after additional factual development.

"A controversy is mooted when there are no longer adverse parties with sufficient legal interests to maintain the litigation.  A moot case presents no Article III case or controversy, and a court has no constitutional jurisdiction to resolve the issues it presents." *United States v. Lares-Meraz*, 452 F.3d 352, 354–55 (5th Cir. 2006) (quoting *Goldin v. Bartholow*, 166 F.3d 710, 717 (5th Cir. 1999) (additional citations omitted)).  "Accordingly, an actual, live controversy must remain at all stages of federal court proceedings, both at the trial and appellate levels.  That is, the requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." *Id.* (quoting *de la O v. Hous. Auth. of El Paso*, 417 F.3d 495, 499 (5th Cir.) (internal quotation marks and citations omitted), *cert. denied*, __ U.S. __, 126 S. Ct. 808 (2005)); *see also Spencer v. Kemna*, 523 U.S. 1, 7 (1998); *United States v. Clark*, 193 F.3d 845, 847 (5th Cir. 1999).  Whether a case is moot is a jurisdictional issue because it implicates Article III's requirement of a live case or controversy. *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987).  Because mootness is a jurisdictional issue, a party may raise it at any time in the litigation and a court may—indeed must—raise the issue *sua sponte* if a case or claim becomes moot. *Lares-Meraz*, 452 F.3d at 355 (citing *Donovan v. Air Trans., Dist. Lodge No. 146*, 754 F.2d 621, 624 (5th Cir. 1985); *Bailey*, 821 F.2d at 278).

At the December 2005 evidentiary hearing, Jones, through counsel, conceded that she lacked personal knowledge of virtually all the traffic signals about which she complained.

Jones's complaints about installation of new poles in METRO's RCTCS Project that disrupted the surrounding sidewalk was limited to the following three intersections: (1) San Felipe at Voss; (2) Kirby at North Braeswood; and (3) Stanford at Alabama.[18]  (Docket Entry No. 121 at 131–32).  With respect to the third intersection, Stanford at Alabama, Jones did not articulate a specific complaint against METRO.  She did not assert difficulty in accessing the traffic signal at this intersection.  Otten did not include concerns about this traffic signal in his report.  In her deposition, Jones complained only about the lack of barriers around the construction area at that site, not about the METRO traffic control signal.  (Docket Entry No. 132, Ex. 2 at 358–61).  With respect to the first two intersections, the evidence showed that METRO's work has been complete at these intersections for over ten years and that both intersections have been subject to significant construction by other entities in the intervening period.

Jones's claims against METRO are moot.[19]  The record does not show that METRO intends to continue or repeat the RCTCS Project work at these intersections.  Jones cannot show a reasonable anticipation that the asserted harm will recur.  *See generally City of Los Angeles v. Lyons*, 461 U.S. 95 (1983).

---

[18]  This can also be viewed as proof that Jones lacks standing to challenge any METRO activity beyond these three intersections.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).

[19]  This evidence similarly indicates a related jurisdictional issue, redressability.  The significant time gap coupled with the very minimal control that METRO may exercise over this area raise additional jurisdictional concerns. Discovery and further factual development clarified these problems.

Jones's claims against METRO, other than for the three intersections about which she testified, are dismissed.  The evidence shows that the three intersections about which Jones complains are not in violation of the governing requirements, or, alternatively, that any ADA violation at these curbs has not been caused by METRO.  The claims against METRO are dismissed.

## V.     Conclusion

Jones's claims against METRO are dismissed with prejudice.

Jones's motion for interim attorneys' fees is denied without prejudice.

Jones's motion for reconsideration is denied.

Jones's claims against the City are granted in part and denied in part.  The City must perform repair or construction work necessary to bring the following curb cuts and ramps into compliance with ADAAG and TAS:

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Fairview | Elmen | Southwest/South |
| Fairview | Hazard | Southeast |
| Fairview | Huldy | Northwest |
| Fairview | Huldy | Northeast/North |
| Fairview | Huldy | Southeast/North |
| Fairview | McDuffie | Northeast |
| Fairview | Woodhead | Northwest/North |
| Greenbriar | Norfolk | Southwest |
| Webster | Austin | Southeast |

| | | |
|---|---|---|
| Webster | Bagby | Northeast/East |
| Webster | Brazos | Northwest/North |
| Webster | Crawford | Southwest |
| Webster | Crawford | Southeast |
| Webster | Jackson | Northeast/North |
| Webster | LaBranch | Southwest/South |
| West Alabama | Dunlavy | Northwest |
| West Alabama | Dunlavy | Northeast |
| West Alabama | Dunlavy | Southeast |
| West Alabama | Eastside | Southeast |
| West Alabama | Garrott | Southeast/South |
| West Alabama | Jack | Southeast/South |
| West Alabama | Mandell | Northeast/North |
| West Alabama | Montrose | Northeast/North |
| West Alabama | Mt. Vernon | Northeast/North |
| West Alabama | Mulberry | Northeast/East |
| West Alabama | Mulberry | Northeast/North |
| West Alabama | Stanford | Northwest/North |
| West Alabama | Stanford | Northeast/East |
| West Alabama | Stanford | Southeast/South |
| West Alabama | Stanford | Southeast/East |
| West Alabama | Yoakum | Southwest/South |
| Westheimer | Midlane | Southeast |
| Westheimer | Dunlavy | Northeast |
| Westheimer | Yoakum | Southwest/East |

The parties are to confer on a reasonable timetable for such work and submit a proposed form of permanent injunction order no later than **September 15, 2006**.

The parties are ordered to advise this court as to the issues remaining in this case, including damages and fees, and a proposed schedule for resolving them, no later than **September 15, 2006**.  A hearing will be held on **September 26, 2006, at 10:00 a.m.** to set a schedule to conclude this case.

SIGNED on August 29, 2006, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

77

**Appendix A: Corners Where New Curb Ramps Compliant with ADAAG/TAS Standards Have Been or are Under Contract to be Constructed**

| Street 1 | Street 2 | Corner |
|----------|----------|--------|
| Kirby | Ella Lee | Northeast |
| Kirby | Ella Lee | Northwest |
| Kirby | Ella Lee | Southeast |
| Kirby | Ella Lee | Southwest |
| Kirby | Locke | Northeast |
| Kirby | Locke | Northwest |
| Kirby | Locke | Southeast |
| Kirby | Locke | Southwest |
| Kirby | Steel | Northwest |
| Kirby | Steel | Southwest |
| Fairview | Brun | Northeast/North |
| Fairview | Driscoll | Southeast |
| Fairview | Driscoll | Northwest/North |
| Fairview | Elmen | Northwest/North |
| Fairview | Elmen | Northeast/North |
| Fairview | Elmen | Southeast/South |
| Fairview | Hazard | Southeast |
| Fairview | Hazard | Southwest |
| Fairview | Hazard | Northeast |
| Fairview | Hazard | Northwest |
| Fairview | McDuffie | Northwest |
| Fairview | McDuffie | Southeast |
| Fairview | McDuffie | Southwest |

| Fairview | Park Avenue | Northeast/North |
| Fairview | Park Avenue | Southeast/South |
| Fairview | Park Avenue | Southwest/South |
| Fairview | South Shepherd | Northeast/North |
| Fairview | South Shepherd | Southeast/South |
| Fairview | Woodhead | Northeast/North |
| Fairview | Woodhead | Northwest/North |
| Fairview | Woodhead | Southeast/North |
| Webster | Austin | Northeast |
| Webster | Austin | Northwest |
| Webster | Austin | Southwest |
| Webster | Bagby | Southeast/East |
| Webster | Brazos | Northwest/North |
| Webster | Caroline | Northeast/East |
| Webster | Caroline | Northeast/North |
| Webster | Caroline | Southeast/South |
| Webster | Chenevert | Northwest |
| Webster | Crawford | Northeast |
| Webster | Jackson | Northwest |
| Webster | Jackson | Southwest |
| Webster | LaBranch | Northeast |
| West Alabama | Argonne | Northeast |
| West Alabama | Argonne | Northwest |
| West Alabama | Bute | Southeast/South |
| West Alabama | Dunlavy | Southwest |

| West Alabama | Edloe | Northeast |
| West Alabama | Edloe | Northwest |
| West Alabama | Eastside | Southwest |
| West Alabama | Ferndale | Northeast |
| West Alabama | Ferndale | Northwest |
| West Alabama | Flora | Northeast/North |
| West Alabama | Flora | Northwest/North |
| West Alabama | Garrott | Southeast/East |
| West Alabama | Graustark | Northwest/North |
| West Alabama | Graustark | Northeast/South |
| West Alabama | Graustark | Southeast/South |
| West Alabama | Mandell | Southwest/South |
| West Alabama | Mandell | Northeast/East |
| West Alabama | Mandell | Northwest |
| West Alabama | Montrose | Southwest |
| West Alabama | Montrose | Southeast/South |
| West Alabama | Mulberry | Northeast/North |
| West Alabama | Mount Vernon | Northwest/North |
| West Alabama | Mount Vernon | Northwest/West |
| West Alabama | Mulberry | Northwest/North |
| West Alabama | Mulberry | Northwest/West |
| West Alabama | Mulberry | Southeast/Southeast |
| West Alabama | Mulberry | Southwest/South |
| West Alabama | Mulberry | Southwest/West |
| West Alabama | Revere | Northeast/North |

| | | |
|---|---|---|
| West Alabama | Revere | Northwest |
| West Alabama | Revere | Southwest/South |
| West Alabama | Roseland | Northwest/North |
| West Alabama | Stanford | Southeast/East |
| West Alabama | Timmons | Northeast |
| West Alabama | Timmons | Northwest |
| West Alabama | Wesleyan | Northwest |
| West Alabama | Wesleyan | Northeast |
| West Alabama | Yoakum | Northeast/East |
| West Alabama | Yoakum | Northeast/North |
| West Alabama | Yoakum | Northwest/North |
| West Alabama | Yoakum | Southwest/West |
| West Alabama | Yupon | Northeast/North |
| West Alabama | Yupon | Northwest/West |
| West Alabama | Yupon | Northwest/North |
| West Alabama | Yupon | Southwest/South |
| West Alabama | Yupon | Southwest/West |
| Westheimer | Argonne | Southeast |
| Westheimer | Argonne | Southwest |
| Westheimer | Buffalo Speedway | Southeast |
| Westheimer | Claremont | Northeast |
| Westheimer | Commonwealth | Northwest/North |
| Westheimer | Commonwealth | Northeast/North |
| Westheimer | Commonwealth | Southwest/South |
| Westheimer | Drexel | Southeast |

81

| Westheimer | Drexel | Southwest |
| Westheimer | Dunlavy | Northwest |
| Westheimer | Dunlavy | Southeast |
| Westheimer | Dunlavy | Southwest |
| Westheimer | Eastside | Northwest |
| Westheimer | Eastside | Northeast |
| Westheimer | Grant | Northeast |
| Westheimer | Grant | Northwest |
| Westheimer | Hazard | Northeast |
| Westheimer | Hazard | Northwest |
| Westheimer | Hazard | Southeast |
| Westheimer | Kingston | Northwest |
| Westheimer | Kirby | Northwest |
| Westheimer | Kirby | Southeast/East |
| Westheimer | Kirby | Southeast/South |
| Westheimer | Kirby | Southwest |
| Westheimer | Lake | Northeast |
| Westheimer | Lake | Northwest |
| Westheimer | Maconda | Northeast |
| Westheimer | Mandell | Southwest/South |
| Westheimer | Mandell | Southeast |
| Westheimer | Mason | Northeast/East |
| Westheimer | Mason | Northwest |
| Westheimer | Mid Lane | Northwest |
| Westheimer | Montrose | Northeast |

| Westheimer | Montrose | Northwest |
| Westheimer | Newman | Southeast |
| Westheimer | Newman | Southwest |
| Westheimer | Peckham | Southeast |
| Westheimer | Peckham | Southwest |
| Westheimer | Revere | Southwest |
| Westheimer | River Oaks Blvd. | Northeast |
| Westheimer | Stanford | Northeast |
| Westheimer | Taft | Northeast/North |
| Westheimer | Taft | Northwest |
| Westheimer | Taft | Southeast |
| Westheimer | Waugh | Northeast |
| Westheimer | Westgate | Northeast |
| Westheimer | Westgate | Southeast |
| Westheimer | West Lane Drive | Northwest |
| Westheimer | Whitney | Northeast |
| Westheimer | Whitney | Northwest |
| Westheimer | Whitney | Southwest |
| Westheimer | Woodhead | Northeast/North |
| Westheimer | Woodhead | Northwest |
| Westheimer | Woodhead | Southwest |
| Westheimer | Yoakum | Southwest/North |